STATE OF MAINE                          BUSINESS & CONSUMER COURT
CUMBERLAND, ss.                         CIVIL ACTION
                                        DOCKET NO. BCD-CV-18-02

CHARLES R. MAPLES, and          )
KATHY S. BROWN,                 )
                                )
            Plaintiffs,         )
                                )       **ORDER AWARDING ATTORNEY**
     v.                         )       **FEES FOLLOWING BENCH TRIAL**
                                )       **AND APPEAL**
EVAN CONTORAKES, CHERI          )
CONTORAKES, COMPASS             )
HARBOR VILLAGE, LLC, and        )
COMPASS HARBOR VILLAGE          )
CONDOMINIUM ASSOCIATION,        )
                                )
            Defendants.         )


Plaintiffs have substantially prevailed in this complicated, hard-fought, novel, multi-year case about the longstanding and pervasive mismanagement and misconduct of the Compass Harbor Village, LLC (the "LLC") and Compass Harbor Village Condominium Association (the "Association"). Plaintiffs now seek an award of attorney fees in connection with their successful claims for breach of fiduciary duty and for inspection and demand. Defendants acknowledge Plaintiffs have prevailed, at least in part, and are entitled to some fees (although for unknown reasons Defendants have not yet paid even the fees they do not dispute), but seek an approximately fifty percent deduction in the fees requested. For the reasons discussed below, and with one minor adjustment, the Court finds Plaintiffs' request for fees thoroughly reasonable and justified, and orders Defendants to pay Plaintiffs $243,170.38 in attorney fees within ten (10) calendar days of the date this Order is docketed.

In determining what constitutes a "reasonable" attorney fees award, the trial court considers many factors. *Homeward Residential, Inc. v. Gregor*, 2017 ME 128, ¶ 15, 165 A.3d 357. In this

1

case, counsel for Plaintiffs has already removed from the attorney fees request time devoted to claims that do not support an award of attorney fees, or the Unfair Trade Practices Act claim which was reversed on appeal. As to the remaining time, it is fair and reasonable to note that Plaintiffs claim for breach of fiduciary duty lay at the heart of their case, and extended into nearly every corner of the litigation. It is unnecessary and unjustified to ask Plaintiffs to further attempt to segregate the time spent on the various issues in this case.

After careful review of the fee affidavit, and the opposition,[1] the Court finds the time and labor expended were required. The issues presented were novel and difficult, and Defendants gave no quarter. In order to prevail, counsel for Plaintiffs demonstrated top tier skill in performing the legal services. The scope of this case periodically prevented counsel from spending significant time on other matters. The hourly fees for Plaintiffs' counsel reflect customary hourly rates in the community. Plaintiffs obtained a high degree of success in a constantly uphill battle against intransigent opponents. Plaintiffs' counsel has significant experience and abilities, and enjoys an excellent reputation. The case must have appeared undesirable at the outset, given all the challenges involved. The damages awards obtained exceed similar cases. For all of these reasons and more, with the one exception discussed below, the Court finds the Plaintiffs' attorney fees request to be very reasonable.

The one exception is as follows. It is appropriate to deduct an additional 7.6% from the fees incurred in the appeal, since Plaintiffs did not prevail on the UTPA claim. The percentage reflects the amount of page space given to the issue in the appeal briefs. Plaintiffs' counsel

---

[1] The Court has considered, and rejected, Defendants various objections to what they refer to as block billing; alleged double billing; and the manner in which Plaintiffs have allocated time. None of the Defendants arguments are persuasive.

incurred $26,144 in fees for the appeal.  Accordingly, the Court deducts and additional $1,986.94 from the amount Plaintiffs already deducted.

Plaintiffs seek an overall attorney fees award of $245,157.32.  Subtracting $1,986.94 from this amount, the Court awards **$243,170.38**.

**CONCLUSION**

For the reasons discussed above, Defendants must pay to Plaintiffs the amount of $243,170.38 in attorney fees within ten (10) calendar days of the date this Order is docketed.[2]

The Clerk is instructed to incorporate this Order by reference on the docket for this case.

So Ordered.


Dated: _August 5, 2020___                                      _____/s_____
                                                                Michael A. Duddy
                                                                Judge, Business and Consumer Court

---

[2] The ten days may seem a short amount of time, but the better practice would have been for Defendants to have promptly paid Plaintiffs long ago the more than $100,000 in fees that were not disputed.

CHARLES R. MAPLES AND
KATHY S. BROWN

      v.

EVAN CONTORAKES,
CHERI CONTORAKES,
COMPASS HARBOR VILLAGE CONDO. ASSOC.,
AND COMPASS HARBOR VILLAGE, LLC

| **Party Name:** | **Attorney Name:** |
|---|---|
| Charles R. Maples and Kathy S. Brown | Brendan Rielly, Esq. <br> **Jensen, Baird, Gardner & Henry** <br> PO Box 4510 <br> Portland, ME 04112 |
| Evan Contorakes, Cheri Contorakes, Compass Harbor Village Condo. Assoc., and Compass Harbor Village, LLC | Jason Theobald, Esq. <br> **Curtis Thaxter, LLC** <br> PO Box 7320 <br> One Canal Plaza Suite 1000 <br> Portland, ME 04112-7320 |

BUSINESS & CONSUMER COURT  
CIVIL ACTION  
DOCKET NO. BCD-CV-18-02

CHARLES R. MAPLES, and )  
KATHY S. BROWN, )  
                 )  
       Plaintiffs, )  
                 )  
     v. )  
                 )  
EVAN CONTORAKES, CHERI )  
CONTORAKES, COMPASS )  
HARBOR VILLAGE, LLC, and )  
COMPASS HARBOR VILLAGE )  
CONDOMINIUM ASSOCIATION, )  
                 )  
       Defendants. )

**ORDER FOLLOWING**  
**BENCH TRIAL**

This case is about the longstanding and pervasive mismanagement and misconduct of the Defendants in connection with the Compass Harbor Village Condominiums in Bar Harbor, Maine. Since 2007, and for a period of over ten years to the present, the Association and the Declarant have repeatedly and comprehensively violated important requirements of the Declaration and Bylaws, as well as applicable provisions of the Maine Condominium Act, 33 M.R.S. §§ 1601-101 through 1604-118 (2018), and the Maine Nonprofit Corporation Act, 13-B M.R.S. §§ 101-1406 (2018). As a result, Plaintiff unit owners have experienced financial loss, extreme frustration and mental anguish, and have been deprived of the enjoyment of their condominiums.

This case was tried to the Bench on April 8-9, 2019. The trial followed this Court's Order on Cross-Motions for Partial Summary Judgment which granted summary judgment for Defendants on Counts VI (Implied Warranty), VII (Fraud), and VIII (Personal Liability) and denied Plaintiffs' Motion. The remaining counts in Plaintiffs' Complaint, as well as Defendants' Counterclaim, remained for trial. The parties filed concurrent post-trial briefs on May 31, 2019.

At the trial, Plaintiffs called Charles Maples ("Maples"), Joseph Carlton, Esq., Casey Hardwick ("Hardwick"), and Kathy Brown ("Brown") to testify. Barbara Giffords' testimony was presented by way of her deposition transcript. Cheri Contorakes' testimony was also presented by way of her deposition transcript. Defendants called Evan Contorakes ("Contorakes") to testify. Exhibits 1-73 were admitted into evidence by agreement, with the exception of exhibits 11, 15, 17, 30, 38, 39, 58, and 59 which were withdrawn. The Court has considered all the evidence admitted at trial, and assessed the credibility of witnesses. For the reasons discussed below, Plaintiffs have substantially prevailed on their claims.

## FINDINGS OF FACT

Based on the stipulations of the parties and the evidence adduced at trial, and drawing all reasonable inferences therefrom, the Court makes the following findings of fact. Defendant Compass Harbor Village, LLC ("Compass Harbor" or "Declarant") was established on or about September 15, 2006. Defendant Evan Contorakes[1] was and is its sole member. Mr. Contorakes is a longtime entrepreneur and real estate developer of residential and commercial properties, including at least one prior condominium development. In 2007, Compass Harbor created the Compass Harbor Village Condominiums in Bar Harbor, Maine, pursuant to the Maine Condominium Act, 33 M.R.S. §§ 1601-101 through 1604-118. Compass Harbor is the Declarant. The Declaration is dated January 25, 2007 and is recorded in the Hancock County Registry of Deeds on March 2, 2007 (hereafter "Decl.").

The Compass Harbor Village Condominiums consists of twenty-four residential units, comprised of several stand-alone units with the rest of the units connected in three rows. Defendant Compass Harbor Village Association (the "Association") was incorporated on or about July 18,

---

[1] Evan Contorakes and his wife, Defendant Cheri Contorakes, are individual Defendants in this action, but in its Order on Cross-Motions for Summary Judgment, the Court concluded the Contorakeses are not subject to personal liability.

2

2007. The Association adopted Bylaws prior to the sale of the first unit. The first unit was sold on or about May 14, 2007. In total, Compass Harbor has sold nine of the twenty-four units in the Compass Harbor Village Condominiums. The remaining fifteen units are still owned by Compass Harbor. Because Compass Harbor still owns more than fifty percent of the condominium units, the declarant control period has not yet ended. *See* 33 M.R.S. § 1603-103(d)(1).

The Plaintiffs in this matter are Charles R. Maples ("Mr. Maples") and Kathy S. Brown ("Ms. Brown") (collectively referred to as "Plaintiffs"). Mr. Maples signed his purchase and sale agreement on July 13, 2007 and bought Unit 4 on July 31, 2007. He paid $168,625 for the unit. Ms. Brown signed her purchase and sale agreement with Compass Harbor on June 26, 2007 and bought Unit 9 on July 27, 2007. She paid $133,502 for the unit. Mr. Maples owns a stand-alone unit and Ms. Brown owns a row unit.

Mr. Maples was drawn to Bar Harbor because it was important to his late wife. After she passed in 2006, he spent most days in or around Acadia National Park. The Compass Harbor Village condominiums caught his eye because they are located very close to the entrance to Acadia National Park. Mr. Maples wanted to purchase a condominium rather than a house because he lived in Texas six months of the year and wanted a condominium association to take care of maintenance, paying bills, "accounting for the operation of the 24 units" and other such issues.

Similarly, Ms. Brown bought a condominium unit because she wanted to avoid having to do exterior maintenance such as painting, mowing, raking and weeding. Ms. Brown had never owned any real estate previously. She preferred owning in a condominium association rather than continuing to rent because owners would be more likely than renters to ensure the property was well maintained. A functioning association was important to her because it provided the opportunity to be involved in decision-making and budgets that she never enjoyed as a tenant.

3

By 2008, Defendants had sold nine units (with Declarant retaining ownership of the remaining 15 units). In 2008, the economy went into a downturn. The Declarant did not sell any further units.

After Plaintiffs purchased their units, maintenance "was not a problem" initially, but soon went "downhill." The pool was no longer heated "after the first unit was sold," junk accumulated in the pool, algae grew in it, and the gate and fence were broken. The wood exterior of units began to rot, paint began peeling, gardens and grounds became overgrown with weeds, driveways became full of potholes, and trash often littered the grounds. A dangling light fixture on the exterior of Mr. Maples' unit remained unfixed for years until after the lawsuit was filed. A window on Mr. Maples' unit has remained broken for four and a half years. A hole remained in Ms. Brown's front deck for years, allowing mice to enter her home. Another hole remained in another unit's wall for months after a fire, unfixed even after someone covered the hole with a plywood sign saying "fix me." The common laundry room was rarely, if ever, cleaned, is "gross and disgusting" and its washers and dryers frequently do not operate. Plaintiffs communicated concerns about the poor maintenance to Mr. Contorakes and to the property manager, Mr. McConomy, but most of the problems went unfixed. As a result, the condominium common areas and building exteriors appear shabby and unkempt.

Unlike common area maintenance, which was acceptable at least initially, condominium governance was defective from the start of Plaintiffs' ownership. From the dates they purchased their units in 2007 until after the lawsuit was filed in 2017, Plaintiffs never received notice of any annual, special or regular meeting of the Association or its Board, nor any minutes of any meeting. Plaintiffs never waived receiving notice of meetings and always provided a current address to the Association. Defendants failed to convene any annual, special or regular meeting between 2007

4

and 2017. With the exception of 2017 and 2018, there are no other agendas, notices, or minutes from 2007 to the present. Defendants admit there were no "formally-noticed association meetings" prior to 2017. The annual meetings finally held in 2017 and 2018 were minimalistic affairs, prompted by this litigation, and held solely to go through the motions of electing a Board and officers. Over the course of more than ten years, the Association has never formally met to take or approve any other authorized action.

Upon creation of the Association, the Declarant appointed Mr. and Mrs. Contorakes to the Association's Board of Directors. (*See* Decl., art. 8 at 21.) The Declarant has never appointed a third director. Except for one day in 2017 when Ms. Brown briefly served as a Board member, Mr. and Ms. Contorakes have been the only members of the Board as well as the only officers the Association has ever had. Year after year, until 2017, Defendants never convened an annual meeting at which unit owners could vote to elect directors. Defendants admit this. The Board never elected officers until 2017. In 2017, Defendants finally held an annual meeting, and Mr. Contorakes, Mrs. Contorakes, and Ms. Brown were "elected" to the Board. Mr. Contorakes and Mrs. Contorakes were the only individuals who voted. Ms. Brown stepped down the next day. Defendants failed to fill the vacancy, and Mr. Contorakes and Mrs. Contorakes remain the only directors and officers on the Board. Mr. Contorakes is the President, and Mrs. Contorakes is the Secretary-Treasurer.

For over ten years, the Contorakes have ignored the basic formal requirements of both the Declaration and the Association. The Association was administratively dissolved by the Maine Bureau of Corporations on or about September 10, 2008, then reinstated on or about July 1, 2010, then administratively dissolved again on or about August 18, 2014. It was reinstated again on or about September 21, 2015, then dissolved again on or about August 22, 2016, and was not

5

reinstated until after this litigation was filed. Similarly, Compass Harbor was administratively dissolved on or about August 18, 2014 and was not reinstated until after this litigation was filed. The Association was required to file annual reports each year, but did not. It was Defendants' responsibility to file the "basic documents" keeping the two entities in good standing with the State of Maine and they admit that they did not until after this litigation was commenced.

For over ten years, despite numerous requests from owners, the Association's Board—consisting only of the Contorakeses—has not followed any regular process for establishing budgets or setting assessments. The Board never prepared an estimate of expenses for the Association, never prepared or voted on an estimated annual budget, never called an association meeting to review and vote on a budget, never sent a budget to the unit owners, never sent financial statements to the unit owners, never called a meeting to review or ratify a revised annual budget, and never sent a revised budget to unit owners. Prior to this lawsuit, Mr. Maples never received the only two documents Defendants referred to as "budgets," and neither the Board nor the Association voted to approve those documents as budgets. The documents do not in fact constitute budgets for purposes of the Bylaws. Mr. Contorakes and Mrs. Contorakes simply decided how much money to spend and what expenses to incur.

For over ten years, despite numerous requests from owners, the Board—consisting only of the Contorakeses—has not followed any regular, transparent process for establishing condominium assessments. The Board has never met to designate assessments owed by each unit owner and the Association never voted on said assessments. Mr. Maples and Ms. Brown never received any explanation for why their purported monthly assessments increased from $63 to $140 and from $48 to $121, respectively, and there was never a vote by the Board or the Association on those increases. Neither the Board nor the Association approved any special assessments, although

6

Defendants imposed special assessments. One of the unauthorized special assessments levied in 2015 was supposedly to paint the siding, but the painting never occurred. The Declarant and the Board, acting through the Contorakeses, have capriciously conducted Association business behind the scenes, dispensed with any formalities, and ignored owner requests for explanations and information.

For over ten years the Defendants have regularly taken other actions affecting the Association without ever convening a meeting to hold a vote for the purpose of authorizing the activity. The Board supposedly engaged Mr. McConomy to provide services as the Association's property manager. Mr. McConomy worked at a restaurant in Bar Harbor owned and operated by Mr. Contorakes through an LLC. On May 17, 2007, Mr. McConomy signed a promissory note to Mr. Contorakes personally in the amount of $100,000 relating to his purchase of Unit 14. At some point approximately three to four years ago, Mr. Contorakes entered into a verbal contract with Mr. McConomy pursuant to which Mr. McConomy agreed to serve as property manager for the Association. Mr. McConomy gets paid by reducing his note to Mr. Contorakes by $10,000 per year regardless of how much or little he works.

Without approval or authorization from the Association, Mr. Contorakes agreed with Mr. McConomy that he does not have to pay Association fees until he has paid off his note to Mr. Contorakes. At $10,000 per year, it will take Mr. McConomy ten years to pay off the $100,000 note. Since Mr. Contorakes entered into the agreement three or four years ago, six or seven years remain until Mr. McConomy begins paying Association fees.

Neither the Association nor the Board ever voted to approve hiring Mr. McConomy, nor did they ever vote to approve any agreement whereby Mr. McConomy did not have to pay assessments. Defendants admit this and further admit that Mr. Contorakes entered into these

7

agreements on his own. Making Mr. Contorakes's pattern of conducing Association business based solely on his whim even more egregious, the Declarant assessed the $10,000 in "loan forgiveness" to the Association and also deducted the $10,000 from the assessments the Declarant owes to the Association. Neither the Board nor the Association approved this arrangement, which is obviously in the self-interest of the Contorakes and the Declarant, but disadvantageous to the other owners.

For over ten years the Association's and Declarant's banking practices and records of disbursements have been in complete disarray. Unit owners were routinely directed to remit payment of all regular and special fees to Mr. Contorakes personally at his Florida address, not to the Association. The Association did not even have a bank account until June 2014. There is no evidence where any assessments paid by unit owners were deposited prior to June 2014. Mr. Maples paid monthly assessments of $63 beginning after purchasing his unit in 2007 and continuing through December 2013. Ms. Brown made monthly assessments of $48 from August 2007 until 2009 then monthly payments of $58 from 2009 until September 2014. Association records indicate that unit owners paid assessments in varying amounts at least as far back as 2008 and continuing through 2018. Seven years' worth of purported assessments—from the Association's creation in 2007 through the opening of its account in June 2014—were not deposited into an account belonging to the Association because none existed. From June 2014 through March 1, 2018 (the most recent Association account statement introduced), only six assessment payments were deposited into the Association account.

The same lack of banking control and accounting practices apply to assessments paid by other owners. For example, the Association's records show that Lucinda Dudley paid at least half of the 2008 assessments and all of 2009-2017 plus one special assessment, but there is no record

of where these payments were deposited. Luere Glover paid 2009-2017 condo fees and the special assessment for litigation. Only two payments were deposited into the Association account. There is no record of where the other payments were deposited, including a check from Ms. Glover dated 11/17/17 to Evan Contorakes. Harriett Burnham paid half of 2008, all of 2009 and 2011, half of 2015-2017 and the special assessment for plumbing and painting. Only Ms. Burnham's payment of $726 on 2/16/16 was deposited into the Association's account. There is no record of where the other payments were deposited.

From August 2014 to June 2017, six assessment payments were deposited into the Declarant's account. A smattering of checks provided by Defendants indicate that the Declarant used the Declarant's bank account to pay Gotts Disposal a total of $100 in 2015, $700 in 2016, and $200 in 2017, and $1,000 to the Bar Harbor Water Authority on November 25, 2016 and again on October 20, 2018. There is otherwise no list of Association expenses paid out of Declarant's account. There is no record of assessment payments ever being transferred into the Association account.

It is clear that the Association and Declarant failed to pay Association expenses out of an Association bank account. Defendants do not dispute this, and contend that Association expenses were paid out of a variety of accounts belonging to Mr. Contorakes or his family, or other businesses in which Mr. Contorakes has an interest but which are unrelated to the Association. This practice appears to have occurred, at least to a limited extent. Accounts belonging to the Contorakes family personally paid the Bar Harbor Water Authority $2,500 in 2016. The Evans Group paid $262.72 on March 4, 2013 to Bar Harbor Water Division, and $100 to Acadia Carpet Care on September 16, 2016. However, Defendants failed to maintain any accounting, management, or other system for tracking payments made for Association expenses. Because

9

Association expenses were not paid out of an Association account, Defendants failed to maintain any system by which unit owners could understand the basis for their assessments.[2]

It is perhaps not surprising that Defendants failed to use an Association bank account to pay Association expenses. Despite owning 15 of the 24 units, the Declarant never paid its assessments for condominium fees, whether into a bank account for the Association or otherwise. For over ten years, indeed from the inception of the condominium development, despite owning well over half of the units, the Declarant has failed to pay its condominium fees on its fifteen units.

The Plaintiffs made multiple requests for information and documents from Defendants. On August 10, 2015, Mr. Maples restated in writing a prior request for documentation of "special assessment fees," an accounting statement and "all of the information that has been requested prior to [August] 14th." On August 10, 2015, Ms. Brown also followed up on prior requests for records and information by emailing Mr. Contorakes to request a "PROPER ACCOUNTING of how [Association] money is spent." On August 22, 2015, Ms. Brown emailed Mr. Contorakes again to request the following:

> (1) We request a yearly budget from the year 2007 to the present, and not in short form as you have previously given, but as an official document.
>
> (2) We would like to know the name of the company for the Insurance and copies of the policy.
>
> (3) The email addresses of all Compass Harbor cond [sic] owners would be appreciated.
>
> (4) We request the names of the companies with which Compass Harbor is doing business for the last 5 years and their telephone numbers and addresses.
>
> (5) We would like to know what businesses Compass Harbor had used in the last 8 years, but which no longer are using.

---

[2] Because some payments were made, from whatever sources, minimal, basic services such as electricity, propane, and occasional trash pick-up have been provided to the condo's common areas.

(6) How many employees work for Compass Harbor and what are their responsibilities?

(7) Are all the condos' taxes paid and up to date?

She received no response.

Ms. Brown emailed Mr. Contorakes again on August 26, 2015, asking for "documentation for the costs of maintenance of the condos which my fees have helped pay for during the past five years, and all invoices for services which the special assessment fees will cover." Mr. Contorakes replied to Ms. Brown's August 10 email, providing the name of the insurance agent but never provided a copy of the policy. He identified a current and former property manager and the names of four companies or individuals with whom the Association did business but otherwise did not provide the requested documents and information. He specifically refused to provide budgets. In response to Ms. Brown's question about whether the condominiums' taxes were paid, Mr. Contorakes responded: "Mine are."

On December 3, 2015, an attorney representing Mr. Maples at the time, Joseph Carleton, Jr., Esq., sent a letter to the registered agent and attorney for the Association, demanding pursuant to 33 M.R.S. § 1603-118(a) the production of:

> (1) Records of receipts and expenditures affecting the operation and administration of the association and other appropriate accounting records since its creation.
>
> (2) Minutes of all meetings of its unit owners and executive board other than executive sessions, a record of all actions taken by the unit owners or executive board without a meeting and a record of all actions taken by a committee in place of the executive board on behalf of the association, since the Association was formed
>
> (3) Copies of all rules of the Association current in effect.
>
> (4) All financial statements and tax returns of the association for the past 3 years;
>
> (5) Financial and other records sufficiently detailed to enable the association to comply with the following subsections of section 1604-108 of the Maine Condominium Act:

11

> (a) relating to reserves for capital expenditures
> (b) relating to the most recently prepared balance sheet and income and expense statement
> (c) the most recently prepared budget
>
> (6) Copies of current contracts to which the Association is a party;
>
> (7) Ballots, proxies and other records related to voting by unit owners after the election, action or vote to which they relate.

Plaintiffs also verbally requested records on many occasions, particularly requesting documentation for their condominium fees, but prior to this litigation never received any response. Plaintiffs sought records in order to understand and fulfill their duties and obligations as unit owners. Prior to this litigation, Plaintiffs never received any response to the many written requests for records and information made by them or by Attorney Carleton. Defendants admit this. Defendants never provided Plaintiffs with any explanation for not providing the requested documents and information.

In addition to requesting records, Attorney Carleton's December 3, 2015, letter put Defendants on notice that Mr. Maples and others were contemplating bringing claims for willful misconduct and gross negligence by the directors, violation of fiduciary duty on the part of the Declarant, and other causes of actions, including for attorney fees.

For over ten years, Defendants have conducted business behind the scenes; failed to institute or utilize any regular banking, accounting, or management systems; failed to recognize the need for or observe any formalities; failed to hold any meetings for the purposes of conducting Association business; and generally ignored the legitimate requests and needs of the owners, including Plaintiffs, because the Contorakeses control everything. Since they control everything, the Contorakeses have taken the position that they don't need any meetings, and can conduct business however they wish, because they can dictate the outcome of any vote.

Barbara Baron Giffords owned Unit 10, a row unit of 500 square feet, that she purchased in 2007. In March 2018, she sold her unit to her niece for the balance of her mortgage, which was $80,000, a loss of approximately $50,000. Ms. Giffords could no longer stand owning the unit because Defendants never responded to her repeated requests over many years for records and information like bank statements, what it cost to operate the Association, and documentation of her purported assessments. Since 2013, four of the originally purchased units have sold to third parties, for an average loss of approximately $53,000.

In 2018, Mr. Maples listed his unit for sale with a local realtor, for $199,800. By that point in time, Mr. Maples had become thoroughly exasperated with the Contorakeses' shockingly poor management, lack of responsiveness, and dictatorial control of the Declarant, Board, and Association. Mr. Maples had suffered mental anguish, lost enjoyment of his condo, and was no longer able to tolerate staying at the condo. At the time of trial, Mr. Maples's unit had not sold and had been on the market for 297 days.

As with Mr. Maples, Ms. Brown has experienced mental anguish and substantially lost the enjoyment of her condo due to the conduct of Defendants. Ms. Brown purchased her unit expecting a functional condominium association, and instead now feels like a renter. She has been frustrated in the extreme by Defendants' failure to respond to her information requests. She has never received an explanation for why her condo fees increased over the years. For good reason, Ms. Brown doesn't trust Mr. Contorakes. Ms. Brown would consider selling her unit, but the other individually-owned units that have sold have lost an average of approximately $53,000.

Renting is not a viable option for either Plaintiff. Mr. Maples bought his unit to use, not to rent. He has not rented his unit because he would be an "absentee landlord" six months each year, would have to hire someone to manage the unit, and is concerned about the expense and

13

"aggravation" of being a landlord. Mr. Maples notes that tenants "don't take care of things the way I would if I owned it." Ms. Brown cannot rent her unit because she lives in it.

In December 2013, in response to what he considered Defendants' comprehensive failure to perform as required under the Declaration and the Bylaws, Mr. Maples stopped paying his monthly assessment fees to Mr. Contorakes. Instead, Mr. Maples began paying his fees into an escrow account. The escrow account now contains approximately $5,000. Similarly, in September 2014, Ms. Brown stopped paying her $58/month condo fees, and instead began paying the fees into an escrow account. Checks sent from the Bank to pay her fees were being returned with no forwarding address. Further, Ms. Brown objected to the purported assessment increase to $121/month in December 2015, especially since Defendants provided no explanation, meetings, budgets, or basis for the increase. Prior to the purported increase, Ms. Brown considered the $58/month assessment a fair amount for the modest services provided.

Since approximately 2010, the Declarant has rented its fifteen units to temporary tenants on an annual basis, and keeps its units rented 98% of the time. Currently, 100% of the Declarant's units are rented. Tenants frequently have pets, and the Declarant and Association do not enforce the pet regulations contained in the Bylaws.

**CONCLUSIONS OF LAW**

The Court makes the following conclusions of law, organized under each of the respective, remaining counts of the Complaint and the Counterclaim.

### Breach of Contract (Complaint, Count I)

The Declaration and Bylaws are contracts between the Declarant and the Association, on the one hand, and the unit owners, including Plaintiffs, on the other. Defendants concede this point: "Plaintiffs have met their burden of showing that there was a contract between Plaintiffs

14

and Defendants. There was no dispute at trial, or throughout the course of this case, that there was in fact a contract between and amongst them." (Def.'s Proposed Findings of Fact and Conclusions of Law p. 5.) *See also See Morison v. Wilson Lake Country Club*, 2005 ME 71, ¶ 20, 874 A.2d 885. Based on the evidence adduced at trial, along with the agreement of the Defendants, the Court concludes Plaintiffs have proven the existence of enforceable contracts with the Declarant and the Association.

Section 2.4 of the Declaration requires the Association to maintain limited common areas, common areas, and the exterior of buildings. Section 6.2(h) requires the Association to enforce multiple restrictions on pets. Article 8 of the Declaration requires the Board of Directors to be comprised of three people. Article 10 requires that assessments be levied and collected in conformity with the Bylaws. Section 10.1 provides as follows:

> The Board of Directors shall levy and enforce the collection of general and special assessments for common expenses as required by this Declaration and the By-Laws. Assessments shall commence when assessed by the Board of Directors. All common expense annual assessments shall be due and payable in equal monthly installments, in advance, when billed. Special assessments shall be due and payable when assessed, during such period of time as established by the Board of Directors. The Board of Directors may in its discretion change the assessment payment from monthly to quarterly, semi-annual, or annual.

Defendants failed to levy assessments in conformity with the Bylaws, and failed to make any effort at all to collect assessments from the Declarant.

Article II of the Bylaws requires the Association to convene annual and special meetings, properly noticed to owners, at which votes will be taken, for the purposes of conducting Association business. *See also* 13-B M.R.S. § 602; 33 M.R.S. § 1603-108. Pursuant to Article II, Section 4 of the Bylaws, written notices of "every meeting of the Association, stating whether it is an annual meeting or special meeting, the authority for the call, the place, day, and hour of the

15

meeting, and the items on the agenda, including . . . any budget changes . . . shall be given by the Secretary/Treasurer or Clerk at least ten (10) days before the date set for the meeting." Said notice must be given to each member either by hand delivery or mailing. *See also* 33 M.R.S. § 1603-108. "The executive board shall give timely notice reasonably calculated to inform unit owners of the date, time and place and topics proposed to be discussed at meetings of the executive board." *Id.*

In addition to proper notice, according to Article II, Section 6 of the Bylaws, there must be a quorum of more than 50% of the "total interest in the common elements" to conduct a meeting. For the Association to take any action, there must be an affirmative vote of a majority of those present. Only owners of units may vote. Finally, there must be minutes prepared of the meetings. Any action taken on behalf of the Association must be approved either by the Board or the members of the Association at a lawful meeting. Based on the evidence adduced at trial, no lawful action was taken on behalf of the Association from the time Plaintiffs purchased their condos in 2007 to the present.

Article III of the Bylaws requires that the Board of Directors be comprised of three people; that Directors and Officers be elected annually; that the Board convene annual, regular and special meetings, properly noticed, at which votes will be taken, for the purposes of conducting Board business. Article III also requires the annual election of Officers. Article IV requires the Officers to make all necessary filings, to maintain accounts, to maintain a record of receipts and disbursements, to prepare budges, and to keep minutes.

Article V of the Bylaws requires the Association to maintain fiscal controls and to keep books and accounts in accordance with customary accounting principles and practices; to prepare, publish, and adopt budgets; and to make assessments based on the budgets. According to Article

16

V, Section 2, the Board must estimate the amount required by the Association to meet its expenses for each fiscal year, including, but not limited to, management and administration expenses; the estimated costs of repairs, maintenance and replacement of common elements; the cost of such insurance and utilities as may be furnished by the Association; the amount of such reserves as may be reasonably established by the board, including general operating reserves, reserves for contingencies, and reserves for maintenance and replacements; common utility expenses, if any; and other expenses of the Association as may be approved by the Board of Directors including operating deficiencies, if any, for prior periods. (Decl. § 5.2.)

"Within 30 days of the commencement of each fiscal year, the Board shall cause an estimated annual budget to be prepared based on its estimations of annual expenses, and copies of such budget shall be furnished to each member." *Id.* "The Board shall call a meeting of the members not less than 14 nor more than 30 days after such budget is furnished to the members for the purpose of considering ratification of such budget." *Id. See also* 33 M.R.S. § 1603-103(c) & 1603-115(a). "Until the annual budget for a fiscal year is sent to each member by the Board, the member shall continue to pay that amount which had been established on the basis of the previous estimated annual budget." *Id.*

According to Article V, Section 3, the Board can revise assessments and make emergency assessments. If the Board deems the amount of membership assessments to be inadequate by reason of a revision in the estimated expenses or other income, then the Board shall prepare and cause to be delivered to members a revised estimated annual budget for the balance of that fiscal year. The Board shall call a meeting of the members to ratify the revised budget in the same manner as the annual budget. If the Board finds an emergency exists that requires immediate assessment of the members, then the Board may make an emergency assessment not to exceed an

17

amount equal to the then-current monthly assessment for each unit and shall be due and payable when communicated to the members. *Id.*

According to Article V, Section 2 of the Bylaws, each member's assessment is supposed to be based upon the budget approved at the annual meeting. *See also* 33 M.R.S § 1603-115(a) ("assessments must thereafter be made at least annually, based on a budget adopted at least annually by the association"). It is undisputed that Defendants never followed the budget and assessment process specified in the Bylaws. Indeed, but for one day in 2017, Defendants failed to provide a lawfully constituted board of directors with three members to approve a budget or assessments.

Defendants do not seriously contest that they breached the contracts, arguing only that their breaches were technical and not material. (Def.'s Proposed Findings of Fact and Conclusions of Law pp. 5-6.) The Association and the Declarant admit most, if not all, of the following violations, which the Court finds established by the evidence:[3]

    A. failing to make the necessary filings with the Maine Bureau of Corporations (Bylaws, Article IV, Section 5; 33 M.R.S. § 1603-101; 13-B M.R.S. §§ 403-405 & 1301);

    B. failing to maintain a bank account for the Association and failing to deposit Association funds into and pay Association expenses out of an Association bank account (Bylaws, Article IV, Section 4);

    C. failing to maintain banking records, books and accounts in accordance with customary accounting principles and practices (Bylaws Article V, Section 1);

    D. failing to provide a three-person Board (Declaration, Article 8; Bylaws, Article III, Section 5; Article IV, Section 2; 13-B M.R.S. § 702 & 703);

    E. failing to hold annual meetings or other meetings (Bylaws, Article II, Sections 2 and 3; 13-B M.R.S. § 602; 33 M.R.S. § 1603-108);

    F. failing to properly notice meetings (Bylaws, Article II, Section 4; 13-B M.R.S. § 603(1); 33 M.R.S. § 1603-108);

    G. failing to maintain minutes of meetings, (Bylaws, Article II, Section 4; 33 M.R.S. § 1603-118(2));

---

[3] The Court includes corresponding statutory citations, for ease of reference when the Court discusses the Declaratory Judgment count.

H. failing to provide notices and minutes to unit owners, (Bylaws, Article IV, Section 5; 33 M.R.S. §§ 1603-108 & 1603-118);

I. failing to maintain association records (Bylaws, Article IV, Section 5; 33 M.R.S. § 1603-118; 13-B M.R.S. § 715);

J. failing to provide association records to unit owners (Bylaws, Article IV, Section 5; 33 M.R.S. § 1603-118; 13-B M.R.S. § 715);

K. failing to adopt budgets (Declaration, Article 10; Bylaws, Article V, Section 2; 33 M.R.S. § 1603-103(c) & 1603-115(a));

L. failing to properly make assessments (Declaration, Article 10; Bylaws, Article V, Section 2; 33 M.R.S. § 1603-103(c) & 1603-115(a));

M. failing to properly maintain the limited common and common elements and the exterior of the buildings (Declaration, Article 2, Section 2.4; Bylaws, Article V, Section 4(e); 33 M.R.S. § 1603-107); and

N. failing to enforce the pet regulations (Declaration, Article 6, Section 6.2(h).)

The Court further concludes that the breaches were indeed material, cutting to the heart of what it means to be a condo owner, and going to the core of why Mr. Maples and Ms. Brown purchased their condo units. They both expected and wanted a functioning condominium association. What they got, instead, was an utterly dysfunctional Association, run in a callous, dictatorial manner by the Declarant and the Contorakeses, who exhibited an absolute disregard for any of the formalities required by the Declaration and the Bylaws.

To the extent Defendants contest any of the breaches, their arguments are unpersuasive. For instance, Defendants argue the failure to file annual reports is immaterial, because after the litigation was commenced the annual reports were brought up to date. Defendants' failure to comply with the requirement of the Bylaws to timely file reports, however, reflects and underscores the extent to which Defendants disregarded the requirements of the Bylaws.

Defendants argue that Plaintiffs took no action to cure the defective Board. But Defendants never convened a meeting at which a vote could be taken (with the exception of 2017 and 2018), and at all times controlled the Declarant, the Association, and the Board. Further, Defendants took

19

all their actions behind the scenes, without bothering to obtain Board approval. The Plaintiffs were powerless to fix the breaches caused by Defendants.

Moreover, the Declarant and the Association have at all times had the power, control, and authority to provide for a properly constituted Board. The Declarant could have appointed an owner or spouse as a third Director, and the Association (controlled by Mr. and Ms. Contorakes as the only two Directors on the Board) could have appointed an owner or spouse to fill the vacancy. And the pool of potential directors was not limited to owners or their spouses. If an owner of a unit is a business entity, a designated agent of the owner is eligible to serve on the Board. (Decl. § 8.2.) Declarant is a business entity and owns fifteen of the twenty-four units. At any time, the Declarant could have appointed a designated agent to the Board in order to satisfy the three-director requirement, and the Association could have elected a designated agent of Declarant to fill the vacancy. With the exception of one day in 2017, the Declarant and Association have failed to provide the lawfully required three-person Board.

Defendants argue that although they failed to convene formal meetings as required by the Bylaws, their misconduct is excused because the Contorakeses sometimes held informal meetings to which Plaintiffs were invited. The Contorakeses' attempt to rationalize and excuse their behavior only underscores the extent to which they believed they could ignore with impunity the requirements of the Bylaws.

Defendants concede formal budgets were never prepared and presented to Plaintiffs for approval, but argue that failure is immaterial because the cost of basic Association expenses got paid and basic services were provided. Defendants utterly disregard and show nothing but contempt for the right of owners under the Bylaws to participate in and understand the management of their condominiums.

20

The main thrust of Defendants' defense to the breach of contract claim is that Plaintiffs have failed to prove damages. In this Defendants are only partially correct. Plaintiffs were not able to prove that Defendants' breaches have made it impossible for Plaintiffs to sell their units. Other units have sold, albeit at a loss, and it is not possible on the evidence presented to conclude Defendants' breaches make it impossible for Plaintiffs to sell their condos. It is fair, however, to infer that the overall shabbiness of the condominium exteriors and common areas caused by Defendants' deficient maintenance in breach of their contractual responsibilities have caused the value of Plaintiffs units to be decreased. But loss of economic value due to poor upkeep is not the only way in which Plaintiffs have been harmed by Defendants' pervasive and comprehensive breaches of contract.

The Declaration constitutes a covenant running with the land. (Decl. § 6.6.) Further, the Declaration is incorporated into Plaintiffs' deeds, and as such, breaches of the Declaration (and the Maine Condominium Act which it incorporates) are violations of Plaintiffs' real property rights. (Joint Exs. 4, 6.) "Some damage is presumed to flow from a legal injury to a real property right." *Gaffny v. Reid*, 628 A.2d 155, 158 (Me. 1993). In *Gaffny*, several condominium unit owners sued another unit owner for violating the association's bylaws because part of her cottage extended into the limited common element adjacent to her unit. 628 A.2d at 156-157. The trial court found that the plaintiffs had not proven any damages and refused to order the removal of the cottage because there was an inconsistent history of enforcing control over limited common elements and because "the value of the property in its entirety had been improved and that the benefits to plaintiffs from removing the cottage would be minimal or nonexistent." *Id*. at 158. However, the Law Court rejected the trial court's finding that there was no injury and held that Maine law

21

presumes damage from a "legal injury to a real property right." *Id.* Because the overall value of plaintiffs' condominiums had been increased, the Law Court awarded nominal damages.

In this case, Plaintiffs have demonstrated actual damages to their real property rights. For over ten years, the Defendants have systematically and comprehensively denied Plaintiffs of their rights to participate in, know about, and understand the administration and management of their condominium Association; their rights to have the common areas well maintained; their rights to have restrictions on use enforced; their rights to have the Declarant appoint a compliant Board; their right to have properly noticed, formal meetings, at which votes are taken and minutes kept; and their right to expect the Declarant to comply with the Declarant's responsibilities, including but not limited to the Declarant's responsibility to pay the assessment on the fifteen units it owns. The Declarant and Association have seriously damaged and undermined the real property rights Plaintiffs have been guaranteed by the Declaration.

"Any right or obligation declared by this Act is enforceable by judicial proceeding." 33 M.R.S. § 1601-114(b). "If a declarant or any other person subject to this Act fails to comply with any provision hereof or any provision of the declaration or bylaws, any person or class of persons adversely affected by that failure has a claim for appropriate relief." *Id.* § 1604-116. Finally, the "remedies provided by this Act shall be liberally administered to the end that the aggrieved party is put in as good a position as if the other party had fully performed." *Id.* § 1601-114(a). In *Gaffney*, the Law Court awarded nominal damages. However, *Gaffney* does not limit damages for legal injury to nominal damages. Under appropriate circumstances, a court can award more than nominal damages for legal injury to a real property right. *See Knauer Family v. Delisle*, No. RE-08-01, 2008 Me. Super. LEXIS 225, at *11-12 (Sep. 29, 2008) (awarding $20,000 for a comparatively negligible encroachment).

22

Here, Plaintiffs have suffered substantial legal injury, in addition to their loss of economic value. The purpose of an award of compensatory damages for breach of contract is to place Plaintiffs in the same position they would have enjoyed under the Declaration and Bylaws were it not for Defendants' breaches. *Anuszewski v. Jurevic*, 566 A.2d 742, 743 (Me. 1989); *see also Lee v. Scotia Prince Cruises, Ltd*., 2003 ME 78, ¶ 22, 828 A.2d 210; Horton & McGehee, *Maine Civil Remedies* § 4-3(c) at 61 (4th ed. 2004). Damages may not be awarded on the basis of guesswork or speculation. *Carter v. Williams*, 2002 ME 50, ¶ 9, 792 A.2d 1093. A damage award must be supported by the evidence, but damages do not have to be proven to a mathematical certainty, they may be determined to a probability. *Morissette v. Somes*, 2001 ME 152, ¶ 11, 782 A.2d 764. The fact finder is permitted to consider probable and inferential as well as direct and positive proof in determining damages. *Merrill Trust Co. v. State,* 417 A.2d 435, 440-441 (Me. 1980). *See also* Horton & McGehee, *Maine Civil Remedies* § 4-3(b)(2) at 58-60 (4th ed. 2004).

Under the circumstances of this case, one reasonable way to measure the amount of compensatory damages Plaintiffs should be awarded for the Defendants' multiple, serious breaches of the Declaration and Bylaws is to look at what each Plaintiff paid for their unit. Mr. Maples paid $168,625 for his unit; Ms. Brown paid $133,502 for her unit. Due to the pervasiveness and scope of Defendants' breaches, Plaintiffs' legal rights under the Declaration have been substantially impaired and their condos reduced in value. Accordingly, Mr. Maples is awarded damages in the amount of $134,900, which is equivalent to 80% of the price he paid for his unit. That amount reasonably puts Mr. Maples in as good a position as if Defendants had fully performed. Ms. Brown is awarded damages in the amount of $106,801, which is equivalent to 80% of the price she paid for her unit. That amount reasonably puts Ms. Brown in as good a

23

position as if Defendants had fully performed. The Declarant and the Association are joint and severally liable to each Plaintiff for their respective amount of damages.

**Breach of Fiduciary Duty (Complaint, Count II)**

Because Compass Harbor is the Declarant and owns more than fifty percent of the units (fifteen of the twenty-four units), it "is a fiduciary for the unit owners with respect to actions taken or omitted at [its] direction by officers and members of the executive board appointed by the declarant[.]" 33 M.R.S. § 1603-103(a). Defendants do not dispute that Declarant is a fiduciary with regard to Plaintiffs in their capacity as unit owners. (*See* Def.'s Proposed Findings of Fact and Conclusions of Law p. 9.) Indeed, the fiduciary relationship would be hard to dispute. Since Mr. Contorakes is the sole member of the Declarant; the Declarant appointed Mr. Contorakes and Mrs. Contorakes to the Board; with the exception on one day in 2017, for over ten years Mr. Contorakes and Ms. Contorakes have been the only members of the Board; and the Contorakes control the Declarant, the Association, and the Board—the Court concludes Declarant Compass Harbor is a fiduciary with respect to Mr. Maples and Ms. Brown for all actions taken or omitted by the Contorakes as members of the Board. *See id.*

As previously discussed, the Declarant control period has not yet ended. 33 M.R.S. § 1603-103(a), (d)(1). If a wrong accrues during the period of declarant control, and the association gives the declarant reasonable notice of and an opportunity to defend against the action, the declarant who then controlled the association is liable to any unit owner for tort losses not covered by unit owner's insurance. 33 M.R.S. § 1603-111. In this case, the Declarant has had notice of this action and has defended, and there is no evidence Plaintiffs have any applicable insurance. Accordingly, the Declarant is liable to Mr. Maples and Ms. Brown for any tort loss caused by a breach of fiduciary duty.

24

The Law Court has long recognized the common law tort of breach of fiduciary duty. *See, e.g., Morris v. Resolution Trust Corp.,* 622 A.2d 708, 712 (Me. 1993). Litigation frequently involves arguments over whether the relationship gives rise to a fiduciary duty, and if so, what the duty entails. *See, e.g.*, *Oceanic Inn, Inc. v. Sloan's Cove, LLC*, 2016 ME 34, ¶¶ 17-21, 133 A.3d 1021; *Stewart v. Machias Sav. Bank*, 2000 ME 207, ¶¶ 10-11, 762 A.2d 44; *Bryan R. v. Watchtower Bible & Tract Soc'y, Inc.,* 1999 ME 144, ¶¶ 11-16, 738 A.2d 839. In this case, however, the Maine Condominium Act obviates the need to engage in the relationship analysis, because the Act makes the Declarant a fiduciary with respect to actions taken or omitted at its direction by the Contorakes. The Act further imposes an obligation of good faith in the performance of every duty it imposes upon the Declarant, including those cited herein. 33 M.R.S. § 1601-113. "[T]he declarant and its appointees are held 'to a higher standard of care than unit-owner elected directors.'" *Blanchard v. PHP Props, Inc*., Nos. CV-04-281, CV-04-319, 2005 Me. Super. LEXIS 17, at *6-7 (Jan. 14, 2005) (quoting 8 Richard Powell, *Powell on Real Property* § 54A.04 (2000)); *see also Fitch v. Diamond Cove Homeowners Ass'n*, No. BCD-WB-08-47, 2009 Me. Bus. & Consumer LEXIS 26, at *12 n.3 (Nov. 16, 2009). Since we have the necessary relationship and the duty, we can turn to breach, causation, and damages.

Defendants contend that in order to establish breach, Plaintiffs must prove both gross negligence and bad faith. (Def.'s Proposed Findings of Fact and Conclusions of Law p. 9-10.) In arguing for gross negligence, Defendants rely on *WahlcoMetroflex, Inc. v. Baldwin*, 2010 ME 26, ¶ 15-19, 991 A.2d 44. In *WahlcoMetroflex*, the Court held that plaintiff in a breach of fiduciary duty case needed to establish gross negligence. *Id.* ¶ 18. According to *WahlcoMetroflex,* gross negligence is defined as "reckless indifference to or a deliberate disregard" of a body of requirements. *Id.* ¶ 16.

25

*WahlcoMetroflex*, however, can be distinguished on several grounds. First, *WahlcoMetroflex* is a Maine case applying Delaware law. The doctrine of gross negligence is not recognized as a part of Maine law. *Beaulieu v. Beaulieu*, 265 A.2d 610, 612 (Me. 1970). Second, *WahlcoMetroflex* involved a shareholder who held a management position with a for-profit corporation. *Id.* ¶ 2. The case did not involve a declarant of a condominium, and did not entail the analysis of Maine condominium law. The Maine Condominium Act imposes on declarants both a fiduciary duty and a high standard of care, and it logically follows that the burden on Plaintiffs to establish breach is less than gross negligence. But in this case, whether the burden is gross negligence or mere negligence, Plaintiffs have met their burden of proof.

In the case at hand, the Declarant, the Board, and the Contorakeses blatantly disregarded important requirements contained in the Declaration and the Bylaws, and the corresponding duties under the Maine Condominium Act and the Maine Nonprofit Corporation Act—for over ten years. The Declarant displayed continuous reckless indifference and deliberate disregard for its duties under the operative documents, and for the rights of Plaintiffs. Plaintiffs have satisfied their burden to show the Declarant breached its fiduciary duty.

In arguing for the need to show bad faith, Defendants rely on *Seacoast Hanger Condo. II Ass'n v. Martel*, 2001 ME 112, ¶¶ 17-22, 775 A.2d 1166. In *Seacoast Hanger*, however, the defendants were unit owners, not a declarant, and thus not subject to the higher standard of care imposed on declarants. Further, the analysis occurred primarily under The Maine Nonprofit Corporation Act rather than the Maine Condominium Act.[4] Nevertheless, if Plaintiffs' burden requires establishing bad faith, they have easily satisfied that burden.

---

[4] Moreover, given the higher standard of care imposed on a declarant, the Maine Condominium Act logically shifts to the declarant in a breach of fiduciary case the burden to show good faith as an affirmative defense. *See* 33 M.R.S. §§ 1601-113, 1603-103, 1603-111. It does not make sense to construe a declarant's statutory obligation to act in good faith as imposing on a plaintiff the need to show the declarant acted in bad faith. *See id.*

26

According to *Seacoast Hanger,* bad faith "imports a dishonest purpose and implies wrongdoing or some motive of self-interest." *Id.* ¶ 21 (citation omitted). In this case, the Declarant blatantly and wrongfully ignored important requirements of the Declaration, Bylaws, and Condominium Act in order to do whatever it pleased, avoid paying condo assessments for the fifteen units it owns, and to cut self-interested backroom deals like the one with Mr. McConomy. To the extent Plaintiffs have the burden to establish the Declarant's bad faith, they have amply satisfied that burden.

The Declarant's breach of its fiduciary duty to Mr. Maples and Ms. Brown caused both Plaintiffs to suffer loss of real property rights (as discussed above), frustration, mental anguish, devaluing of their condo units, and loss of the enjoyment of their condo units. Mr. Maples became so emotionally unable to use his unit, that he put it on the market. Ms. Brown would have done the same, but she needs to live in her condo.

The tort of breach of fiduciary duty supports an award of compensatory damages.[5] *See Morris,* 622 A.2d at 711. In determining the amount of compensatory damages, the Court is again guided by reference to the original purchase price of Plaintiffs' respective units. Accordingly, Mr. Maples is awarded damages against the Declarant Compass Harbor in the amount of $134,900. Ms. Brown is awarded damages against the Declarant Compass Harbor in the amount of $106,801.

Plaintiffs have also requested an award of attorney fees for prevailing in their claim against the Declarant for its breach of fiduciary duty. "Although a prevailing litigant generally has no right to recover attorney fees, a court may award attorney fees for some kinds of tortious conduct, including a breach of a fiduciary duty." *Murphy v. Murphy*, 1997 ME 103, ¶ 15, 694 A.2d

---

[5] As an equitable remedy, Plaintiffs requested rescission. (Pl.'s Findings of Fact and Conclusions of Law p. 27.) However, too much time has passed since Plaintiffs purchased their units, and so rescission is not an available remedy in this case. *See Mott v. Lombard*, 655 A.2d 362, 365 (Me. 1995) (purchaser must seek rescission within a reasonable time after the conveyance).

932 (citations omitted). "The amount of attorney fees awarded is within the court's discretion and the court is accorded substantial deference in its calculations." *Id.* ¶ 17. Plaintiffs have prevailed in their action against the Declarant for its breach of fiduciary duties owed to them as unit owners and are thus entitled to recover their attorney fees incurred in litigating this claim. Counsel for Plaintiffs can submit an attorney fees affidavit no later than seven business days after the date this decision is docketed. As the statutorily-defined fiduciary, the Declarant is liable for paying the award of attorney fees.

### Unjust Enrichment (Complaint, Count III)

Plaintiffs have not satisfied their burden of proving unjust enrichment. Defendants did supply Plaintiffs with minimal services, and several years ago both Plaintiffs stopped paying condo assessment fees to Defendants. *See, e.g., Howard & Bowie, P.A. v. Collins,* 2000 ME 148, ¶ 13, 759 A.2d 707 (citing *June Roberts Agency v. Venture Properties,* 676 A.2d 46, 49 (Me. 1996)). Accordingly, judgment is granted to Defendants on Plaintiff's claim for unjust enrichment.

### Specific Performance (Complaint, Count IV)

Specific performance is a remedy, not a separate cause of action. *See Sullivan v. Porter*, 2004 ME 134, ¶ 25, 861 A.2d 625. In this litigation, however, Plaintiffs have prevailed on their claims for breach of contract, breach of fiduciary duty, declaratory judgment, and unfair trade practices. Accordingly, Plaintiffs have proven causes of action that could support specific performance. Defendants object on the basis that specific performance is not available because there is an adequate remedy at law—damages. *See id.* (Def.'s Proposed Findings of Fact and Conclusions of Law p.11.) However, "[i]t is within the trial court's equitable powers to apply the remedy of specific performance when a legal remedy is either inadequate or impractical." *Id.* (citation omitted). Here, the Court has awarded damages. Plaintiffs, however, will continue to

28

own their condominium units, and Ms. Brown will continue to live in hers. Accordingly, the damages remedy by itself provides inadequate relief. The Court grants Plaintiffs' request for specific performance as follows.

Defendants must promptly come into substantial compliance with all of the provisions of the Declaration, Bylaws, and corresponding provisions of the Maine Condominium Act and the Maine Nonprofit Corporation Act. Without in any way limiting the comprehensiveness of the Court's order, Defendants must at a minimum specifically perform as follows:

1. The Declarant must promptly populate the Board with three eligible persons. Alternatively, the two existing Directors must promptly vote to fill the current Board vacancy.

2. The Board and the Association must hold formal annual, regular, and special meetings to transact Association business.

3. All Board and Association meetings must be properly noticed to the owners.

4. The Defendants must ensure minutes of all meetings are kept, in sufficient detail to inform owners of what transpired at the meetings.

5. The Defendants must establish banking, accounting, and fiscal controls in accordance with usual and customary practices.

6. The Defendants must only use Association bank accounts for Association deposits and payments.

7. The Declarant must timely deposit into the Association bank accounts the full amount of monthly assessments and special assessments for its fifteen units. That means, without limitation, that monthly assessments on its fifteen units must be actually paid and deposited monthly.

8. The Defendants must formally prepare and adopt budgets.

9. Defendants must formally calculate and set assessments based on formally adopted budgets.

10. The Defendants must promptly provide Plaintiffs with inspection and copying of Association records upon request.

29

11.     Defendants must promptly clean the laundry and ensure all machines are working properly, and then keep the laundry clean and in properly working order.

12.     Defendants must promptly clean, repair, and maintain the pool.

Defendants shall not construe the above list to suggest they are not responsible to comply with any other applicable obligations under the Declaration, Bylaws, and Maine law, even if not specifically mentioned above.

### Attorney Fees Under Maine's Nonprofit Corporation Act (Complaint, Count V)

The Association was organized and exists as a nonprofit corporation.  The Maine Nonprofit Corporation Act provides in relevant part as follows:

> Each corporation shall keep correct and complete books and records of accounts and shall keep minutes of the proceedings of its members, board of directors and committees having any of the authority of the board of directors and shall keep at its registered office or principal office in this State a record of the names and addresses of its members entitled to vote. All books and records of a corporation may be inspected by any officer, director or voting member or the officer's, director's or voting member's agent or attorney, for any proper purpose at any reasonable time, as long as the officer, director or voting member or the officer's, director's or voting member's agent or attorney gives the corporation written notice at least 5 business days before the date on which the officer, director or voting member or the officer's, director's or voting member's agent or attorney wishes to inspect and copy any books or records. The only proper purpose for which a voting member may inspect and copy books or records under this section is the purpose of enabling the member to fulfill duties and responsibilities conferred upon members by the articles of incorporation or the bylaws of the corporation or by law.

13-B M.R.S. § 715(1).  Prior to commencing this litigation, Plaintiffs had repeatedly asked to inspect and copy Association records.  As of the date Plaintiffs initiated this litigation, Defendants had repeatedly refused to allow Plaintiffs to inspect and copy the Association's books and records. Accordingly, in Count V of their Complaint, Plaintiffs requested a court order for inspection and copying of the records demanded.  The Court grants judgment in favor of Plaintiffs on Count V, and orders Defendants to permit the requests for inspection and copying.

As part of their request, Plaintiffs sought an award of attorney fees. Section 715(2)(A) provides in relevant part as follows:

> If the court orders inspection and copying of the records demanded, the court shall also order the corporation to pay . . . reasonable attorney fees, incurred to obtain the order unless the corporation proves that it refused inspection in good faith because it had a reasonable basis for doubt about the right of the officer, director or member to inspect the records demanded.

13-B M.R.S. § 715(2)(A). The Court finds Plaintiffs had a proper purpose in seeking to inspect and copy the Association's records, in order to fulfill their duties and responsibilities as unit-owner members of the Association. The Court further finds Defendants failed to prove they refused inspection in good faith because they had a reasonable basis for doubt about the right of Plaintiffs to inspect the records demanded.

Defendants object to an award of attorney fees on the grounds that the Court did not order inspection and copying, and a court order is a necessary prerequisite to an award of attorney fees. To that effect, the Court has ordered Defendants to permit inspection and copying, and has further ordered the Association to allow Plaintiffs to inspect and copy any and all Association records they wish to inspect and copy, provided Plaintiffs' requests comply with 13-B M.R.S. § 715. *See* this Order at 31 ¶ 10 (granting Plaintiffs specific performance and ordering Defendants to comply with any of Plaintiffs' proper requests to view or copy Association records).

Defendants stonewalled Plaintiffs' document requests for years, and only finally allowed Plaintiffs to inspect and copy Association records under the compulsory obligations of discovery. In argument, Defendants seem to assume that this resolved Plaintiffs' claim for specific performance pursuant to 13-B M.R.S. § 715(2), but the Court concludes that it did not. The Defendants never moved for dismissal or for a summary judgment on mootness grounds. The parties' joint pretrial statement included only a stipulation that "the Association provided the

31

requested records during discovery." Plaintiffs never conceded that this defeated their claim, and Plaintiffs in fact put on evidence in support of this claim at trial, as summarized briefly above.

In any event, Plaintiffs' claim is not moot. "An issue is deemed to be 'moot' when there is no real and substantial controversy, admitting of specific relief through a judgment of conclusive character." *Anthem Health Plans of Maine, Inc. v. Superintendent of Ins.*, 2011 ME 48, ¶ 4, 18 A.3d 824 (quotation omitted). "When determining whether a case is moot, [the court] examine[s] whether there remain sufficient potential effects flowing from resolution of the litigation to justify application of the court's limited resources." *Id.* 13-B M.R.S. § 715(2) In this case, the Court has already heard evidence and argument on Plaintiffs' claim, undercutting the policy rationale behind the mootness doctrine. *See id.* More importantly, as addressed above in the preceding section, Plaintiffs convinced the Court by a preponderance of the evidence that they were entitled to an order requiring Defendants to comply with their contractual and statutory obligations on an ongoing basis. In other words, Defendants' belated acquiescence to Plaintiffs' proper record requests neither took the issue out of controversy nor gave Plaintiffs the specific relief to which they proved they are entitled at trial. *See Anthem Health Plans of Maine, Inc.*, 2011 ME 48, ¶ 4, 18 A.3d 824.

The Court grants Plaintiffs' request for an award of reasonable attorney fees for time expended to obtain inspection and copying of Association records. Counsel for Plaintiffs can submit an attorney fees affidavit no later than seven business days after the date this decision is docketed. The Association and the Declarant, because the Declarant still controls the Association, are joint and severally liable for paying the award of attorney fees.

**Declaratory Judgment (Complaint, Count IX)**

Pursuant to the Uniform Declaratory Judgments Act, 14 M.R.S. §§ 5951-5963, Plaintiffs seek a declaration regarding Defendants' violations of the Declaration, Bylaws, and corresponding provisions of the Maine Condominium Act, 33 M.R.S. §§ 1601-101 through 1604-118, and the Maine Nonprofit Corporation Act, 13-B M.R.S. §§ 101-1406. Defendants correctly point out that the claim is similar to Plaintiffs' breach of contract claim, and Defendants thus argue the claim for declaratory relief "fails for the same reasons noted above." (Def.'s Proposed Findings of Fact and Conclusions of Law p. 12.) In other words, Defendants do not seriously dispute that the violations Plaintiffs assert actually occurred; instead, Defendants object on the grounds of materiality, causation, and damages. Those grounds, however, have little applicability to declaratory relief. The Court concludes that a justiciable controversy exists, *see Annable v. Bd. of Envirnmnt'l Protec.*, 507 A.2d 592, 595 (Me. 1986), and grants Plaintiffs the declaratory relief sought.

The Declaration and the Bylaws constitute enforceable contracts, through which Plaintiffs are granted real property rights incorporated into their respective deeds. Defendants are bound by the terms of the Declaration and Bylaws, and by the applicable provisions of the Maine Condominium Act and the Maine Nonprofit Corporation Act. Defendants have violated the Declaration, Bylaws, and corresponding provisions of the Maine Condominium Act and the Maine Nonprofit Corporation Act in all the ways set forth above in the section discussing breach of contract. Defendants' violations are material, and go to the heart of the Declaration, Bylaws, and the two Acts.

The Court further declares that Mr. Maples was justified in stopping payment of assessments to Defendants as of December 2013. Ms. Brown was justified in stopping payment of assessments to Defendants as of September 2014. By those points in time, Defendants' material

33

violations of the applicable contracts and statutory provisions had become so all-encompassing that Plaintiffs were excused from any obligation to pay assessments.[6] Plaintiffs have no obligation to pay over to Defendants any escrowed assessments. Plaintiffs shall further have no obligation to pay current and future assessments until Defendants substantially comply with all the provisions of the Declaration, Bylaws, and applicable provisions of the Acts.[7] Defendants must nevertheless pay for and continuously provide all necessary services to common areas; services include but are not limited to electricity, propane, trash pick-up, landscaping, maintenance and repair, cleaning of the laundry room, plowing, and pool maintenance. Defendants must pay for assessments owed by Mr. McConomy to the Association notwithstanding the backroom agreement between Mr. McConomy and Mr. Contorakes, and the Declarant must not claim any credit against its assessments for the improper deal with Mr. McConomy. Defendants must not impose or attempt to impose or collect any special assessment to pay for their attorney fees and litigation costs, or for the damages awarded in this action. Additionally, Defendants must promptly provide a resale certificate to Plaintiffs, in a form satisfactory to Plaintiffs, in the event Plaintiffs wish to sell their units.

### **Violation of Unfair Trade Practice Act (Complaint, Count X)**

The Maine Unfair Trade Practices Act ("UTPA") declares that "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are declared unlawful." 5 M.R.S. § 207. Section 213 of the UTPA provides that:

> Any person who purchases or leases goods, services or property, real or personal, primarily for personal, family or household purposes and thereby suffers any loss of money or property, real or personal, as a result of the use or employment by

---

[6] The Court stops short of ordering Defendants to disgorge assessments paid by Plaintiffs prior to the dates they stopped making payments. The evidence establishes that Defendants were providing minimal services for the common areas, and so the Court declines to order disgorgement.

[7] If Plaintiffs refuse to pay assessments once Defendants believe they have become substantially compliant, Defendants can petition this Court for supplemental relief pursuant to 14 M.R.S. § 5960.

another person of a method, act or practice declared unlawful by section 207 or by any rule or regulation issued under section 207, subsection 2 may bring an action either in the Superior Court or District Court for actual damages, restitution and for such other equitable relief, including an injunction, as the court determines to be necessary and proper. There is a right to trial by jury in any action brought in Superior Court under this section.

5 M.R.S. § 213. In this case, Plaintiffs purchased their condominium units for personal or household purposes. As discussed above in the section on breach of contract, Plaintiffs suffered the actual loss of real property rights as a result of Defendants' conduct. Defendants' conduct, especially Defendants' backroom deal with Mr. McConomy and the Declarant's failure to pay assessments for its fifteen condominium units while demanding payment of assessments by Plaintiffs for their two condominium units, constitute unfair or deceptive acts or practices in the conduct of commerce. Accordingly, Plaintiffs have proven that Defendants violated the Maine Unfair Trade Practices Act.

For the reasons set forth in the section on breach of contract, Mr. Maples is awarded damages in the amount of $134,900, which is equivalent to 80% of the price he paid for his unit. Ms. Brown is awarded damages in the amount of $106,801, which is equivalent to 80% of the price she paid for her unit.[8] Since the Contorakeses do not have any personal liability, Declarant and the Association are joint and severally liable to each Plaintiff for their respective amount of damages. Additionally, Plaintiffs are excused from any obligation to pay to Defendants the assessments Plaintiffs withheld and paid into escrow accounts.

Plaintiffs seek an award of attorney fees and costs, pursuant to 5 M.R.S. § 213(2). Defendants object, on the basis that Plaintiffs failed to serve on Defendants the written demand for relief described in 5 M.R.S. § 213(1-A). Defendants' objection, however, is unavailing. Failure

---

[8] Alternatively, in the event of any challenge to the award of damages under the UTPA, the Court awards restitution to Plaintiffs in the same amounts.

to comply with section 213(1-A) does not bar an award of attorney fees, although denying a request for attorney fees is one remedy the Court has at its disposal for noncompliance. *Oceanside at Pine Point v. Peachtree*, 659 A.2d 267, 273 (Me. 1995). In this case, attorney Carleton's letter of December 3, 2015, functionally served as the equivalent of the written demand contemplated by section 213(1-A). Attorney Carleton's letter did not specifically mention the UTPA, but it did identify specific claims and referenced the possibility of other claims. The letter certainly put Defendants on notice that Plaintiffs were considering litigation, and provided Defendants with the opportunity and incentive to engage in settlement negotiations. *Cf. id.*

As a result, Plaintiff's failure to make the specific written demand envisioned by section 213(1-A) does not bar an award of attorney fees on the facts of this case. The Court grants Plaintiffs' request for an award of reasonable attorney fees for time expended in prevailing on their UTPA claim. Counsel for Plaintiffs can submit an attorney fees affidavit no later than seven business days after the date this decision is docketed. Since the Contorakeses have no personal liability, the Association, and because the Declarant still controls the Association , the Declarant, are joint and severally liable for paying the award of attorney fees.

### Breach of Contract (Counterclaim, Count I)

Defendants seek damages for what they allege is Plaintiffs' breach of contract for failure to pay assessments. However, "[o]ne cannot recover damages for a failure to pay under a contract if the non-paying party rightfully withheld payment because the party seeking damages has materially breached the contract." *Island Terrace Owners Ass'n v. Unit 91*, No. RE-10-257, 2012 Me. Super. LEXIS 54, *9-10 (March 22, 2012) (citing Restatement (Second) of Contracts § 237 (1981)). "A material breach is non-performance that is so important that the other party is justified in regarding the whole transaction at an end." *Id.* (citing *Cellar Dwellers, Inc. v.*

36

*D'Alessio*, 2010 ME 32, ¶ 16, 993 A.2d 1). In this case, Defendants materially breached the Declaration and Bylaws, justifying Plaintiffs refusal to pay assessments. Judgment is granted to Plaintiffs on Count I of Defendants' counterclaim.

### Unjust Enrichment and Quantum Meruit (Counterclaim, Counts II & III)

As discussed above, the Declaration and Bylaws constitute valid contracts, which Defendants materially breached. Under Maine law, the existence of a valid contract precludes claims for unjust enrichment. *Lynch v. Ouellette*, 670 A.2d 948, 950 (Me. 1996); *Top of the Track Assocs. v. Lewiston Raceways, Inc.*, 654 A.2d 1293, 1296 (Me. 1995); *Crop Prod. Servs. v. Me. Apple Co.*, No. CV-14-179, 2015 Me. Super. LEXIS 154, at *10-11 (Aug. 28, 2015); *Sav. Bk. of Me. v. Edgecomb Dev.*, No. CV-09-582, 2010 Me. Super. LEXIS 58, at *18-19 (May 18, 2010) (dismissing claim for unjust enrichment); *Kane v. Potter*, No. BCD-WB-RE-08-20, 2009 Me. Bus. & Consumer LEXIS 30, at *14-17 (Feb. 9, 2009); *Developers v. Lacroix*, No. BCD-WB-CV-08-24, 2008 Me. Bus. & Consumer LEXIS 13, at *7 (Oct. 10, 2008) (dismissing claim for unjust enrichment); *see also Hodgkins v. New Eng. Tel. Co.*, 82 F.3d 1226, 1232 (1st Cir. 1996). Under Maine law, the existence of a valid contract also precludes claims for quantum meruit. *Paffhausen v. Balano*, 1998 ME 47, ¶ 9, 708 A.2d 269, 272; *Prest v. Inhabitants of Farmington*, 104 A.2d 521, 524 (Me. 1918); *Crop Prod. Servs.*, 2015 Me. Super. LEXIS at *9-10; *see also Hodgkins*, 82 F.3d at 1232. The law is especially clear when the parties pressing claims for unjust enrichment and quantum meruit are the same parties who materially breached the contracts. *See e.g. Lynch*, 670 A.2d at 950. Accordingly, the Court enters judgment in favor of Plaintiffs on Counts II and III of Defendants' Counterclaim.

## CONCLUSION

For the reasons discussed above, the Court awards Mr. Maples damages in the amount of $134,900, and awards Ms. Brown damages in the amount of $106,801.[9]  The Declarant and the Association are joint and severally liable to Plaintiffs for the damages awards.  The Court also awards attorney fees to Plaintiffs, pursuant to the Maine Nonprofit Corporation Act (Count V) and the Unfair Trade Practices Act (Count X), as well as for the Declarant's breach of fiduciary duty (Count II).  Counsel for Plaintiffs may submit an attorney fees affidavit, and the affidavit should separately specify the fees incurred under each Act and in support of their claim for breach of fiduciary duty.  The Court also awards to Plaintiffs the specific performance and declaratory judgment described herein.  The Court grants judgment to Plaintiffs on all Counts of the Counterclaim, and grants judgment to Defendants on Count III of the Complaint (unjust enrichment).

Pursuant to M.R. Civ. P. 79(a), the Clerk is instructed to incorporate this Order by reference on the docket for this case.

So Ordered.


Dated:  July 22, 2019

_____/s_____
Michael A. Duddy
Judge, Business and Consumer Court

---

[9] The awards of damages under the various claims are in the alternative, and not cumulative. *See Steadman v. Pagels*, 2015 ME 122, ¶ 30, 125 A.3d 713.

STATE OF MAINE
CUMBERLAND, ss.

BUSINESS AND CONSUMER COURT
DOCKET NO. BCD-CV-2018-02 ✓

CHARLES R. MAPLES, et al., )
)
Plaintiffs, )
)
v. )
)
EVAN CONTORAKES, et al., )
)
Defendants. )

ORDER ON CROSS-MOTIONS FOR
PARTIAL SUMMARY JUDGMENT

Plaintiffs Charles Maples and Kathy Brown have moved for summary judgment on Counts I-V,[1] VII, and IX of their Complaint and all three Counts of the Counterclaim. Defendants Evan Contorakes, Cheri Contorakes, Compass Harbor Village, LLC, and Compass Harbor Village Condominium Association (collectively "Defendants") oppose Plaintiffs' motion and move for summary judgment in their favor on Counts VI-VIII and X of Plaintiff's Complaint. Pursuant to the authority granted it by M.R. Civ. P. 7(b)(7), the Court exercises its discretion and rules on the motion without holding oral argument.

FACTS

Compass Harbor Village, LLC (the "LLC") is the declarant and owner of condominium units located in Bar Harbor, Maine that are known collectively as the Compass Harbor Village Condominiums, or "Compass Harbor." (Def's Supp'g S.M.F. ¶ 1.) The LLC created the Compass Harbor Village Condominiums in 2007 and the Compass Harbor Village Association (the "Association") was incorporated on or about July 18, 2007. (Pl's Supp'g S.M.F. ¶¶ 3-4.) Evan Contorakes is the sole member of the LLC and a director and officer of the Association. (Pl's

_____

[1] Plaintiffs' introduction to their memorandum of law states that they "move for summary judgment on Counts 1-4, 7 and 9 in their Complaint...." However, Plaintiffs raise an argument in support of summary judgment on Count V in the body of their memorandum. (Pl's Mot. Summ. J. 11-13.)

1

Supp'g S.M.F. ¶ 2.) Cheri Contorakes is Mr. Contorakes's wife and also a director and officer of the Association. (Def's Supp'g S.M.F. ¶ 3.) The Contorakeses are the only officers and board members of the Association, appointed in the first instance by the LLC, and the LLC has at all times owned more than fifty percent of Compass Harbor's units. (Pl's Supp'g S.M.F. ¶¶ 6, 21-23.)

In 2007, the LLC sold condominium units to Charles Maples and Kathy Brown. (Def's Supp'g S.M.F. ¶ 4.) Mr. Maples was granted a possessory interest in his unit on July 31, 2007 and Ms. Brown was granted a possessory interest in her unit on July 27, 2007. (Def's Supp'g S.M.F. ¶¶ 8-9.) The condominium units were subject to the terms of the Declaration of Condominium (the "Declaration") as well as the Bylaws of the Association. (Def's Supp'g S.M.F. ¶ 5.)

Plaintiffs have moved for summary judgment on several counts of their Complaint: breach of contract (Count I), breach of fiduciary duty (Count II), unjust enrichment (Count III), specific performance (Count IV), violation of Maine's Nonprofit Corporation Act (Count V),[2] and declaratory judgment (Count IX)[3]. Plaintiffs have also moved for summary judgment on all three counts of Defendants' Counterclaim: Breach of contract (Count I), unjust enrichment (Count II), and quantum meruit (Count III).

Defendants oppose Plaintiffs' motion, and move for summary judgment on four counts of the Complaint: Breach of 33 M.R.S. § 1604-113 (Count VI), fraud (Count VII),

[2] Although Count V is labeled "Specific Performance; Maine's Nonprofit Corporation Act," specific performance is not a remedy for statutory violations and Plaintiffs do not request that anything be specifically performed pursuant to that Count. (Pl's Compl. ¶¶ 57-60.) As explained in more detail below, Plaintiffs seek an award of costs and attorney fees pursuant to 13-B M.R.S. § 715(2)(A) in Count V.
[3] Specifically, Plaintiffs seek a declaratory judgment that Defendants have violated the Declaration and Bylaws and, as such, Plaintiffs are entitled to a "disgorgement" of all assessments paid. (Pl's Compl. ¶ 103.)

2

personal liability of Mr. Contorakes and Ms. Contorakes (Count VIII), and violation of Maine's Unfair Trade Practices Act (Count X). Plaintiffs oppose Defendants' motion.

## STANDARD OF REVIEW

"Summary judgment is no longer an extreme remedy." *Curtis v. Porter*, 2001 ME 158, ¶ 7, 784 A.2d 18. "Cross motions for summary judgment neither alter the basic Rule 56 standard, nor warrant the grant of summary judgment per se." *F.R. Carroll, Inc. v. TD Bank, N.A.*, 2010 ME 115, ¶ 8, 8 A.3d 646 (quoting *Wightman v. Springfield Terminal Ry. Co.*, 100 F.3d 228, 230 (1st Cir. 1996)). Summary judgment is granted to a moving party where "there is no genuine issue as to any material fact" and the moving party "is entitled to judgment as a matter of law." M.R. Civ. P. 56(c). "A material fact is one that can affect the outcome of the case, and there is a genuine issue when there is sufficient evidence for a fact-finder to choose between competing versions of the fact." *Lougee Conservancy v. CityMortgage, Inc.*, 2012 ME 103, ¶ 11, 48 A.3d 774 (quotation omitted). To survive a defendant's motion for summary judgment, the plaintiff must establish a prima facie case for every element of the plaintiff's cause of action. *Oceanic Inn, Inc. v. Sloan's Cove, LLC*, 2016 ME 34, ¶ 26, 133 A.3d 1021. "When a plaintiff has the burden of proof on an issue, a court may properly grant summary judgment in favor of the defendant if it is clear that the defendant would be entitled to a judgment as a matter of law if the plaintiff presented nothing more than was before the court" when the motion was decided. *Reliance Nat'l Indem. v. Knowles Indus. Servs., Corp.*, 2005 ME 29, ¶ 9, 868 A.2d 220.

I. The Defendants Are Entitled to Summary Judgment on Count VI of the Complaint Because it is Barred by the Statute of Limitations.

Count VI of the Complaint alleges a breach of 33 M.R.S. § 1604-113, which governs the implied warranty of quality for condominiums under the Maine Condominium Act (the "Act"). The Act imposes a six-year statute of limitations for actions alleging a breach of the implied warranty of quality, although the parties may agree in writing to reduce the period to no less than two years. 33 M.R.S. § 1604-115(a). The limitations period runs *"regardless of the purchaser's lack of knowledge of the breach . . . [from] the time the purchaser . . . enters into possession . . . ." Id.* § 1604-115(b)(1) (emphasis added).

Plaintiffs filed their Complaint on November 30, 2016. Mr. Maples was granted a possessory interest in his unit on July 31, 2007 under the Quitclaim Deed attached to the Complaint. (Def's Supp'g S.M.F. ¶¶ 8; Pl's Compl., Ex. A.) Ms. Brown was granted a possessory interest in her unit on July 27, 2007 under the Quitclaim Deed attached to the Complaint. There is no factual dispute that Plaintiffs filed their Complaint on November 30, 2016—well outside of the six-year limitations period provided for in 33 M.R.S. § 1604-115(a). (Def's Supp'g S.M.F. ¶ 7.)

Plaintiffs acknowledge that section 1604-115 facially applies to their claim for violation of section 1604-113, but urge the Court to apply a common law "discovery rule" and toll the running of the statute of limitations to the "summer of 2016" based on their testimony that that is when they first discovered the Defendants' breach. *See Dunelawn Owners Assoc. v. Gendreau*, 2000 ME 94, ¶ 14, 750 A.2d 591. Plaintiffs' reliance on *Dunelawn* is misplaced. The *Dunlawn* Court held that the statute of limitations provided for in section 1604-115 barred the statutory claim for breach of warranty brought under section 1604-

4

113, and went on to analyze whether the "discovery rule" would nonetheless apply to plaintiffs' common law claims. The Court ultimately held that in the absence of a fiduciary duty, the "discovery rule" would not be applied to the plaintiffs' common law claims. This is not at all the same as holding that the existence of a fiduciary duty requires the application of the "discovery rule" to statutory section 1604-113 warranty claims, as Plaintiffs would have the Court do in this case. The *Dunelawn* Court assumed that the "discovery rule" *cannot* be applied to section 1604-113 actions regardless of the existence of a fiduciary relationship, presumably based on the plain language of section 1604-115(a): ". . . a cause of action for breach of warranty of quality, *regardless of the purchaser's lack of knowledge of the breach*, accrues: (1) As to a unit, at the time the purchaser to who the warranty is first made enters into possession if a possessory interest was conveyed. . . ." (emphasis added). The emphasized language makes clear that the Legislature specifically intended that the discovery rule would not be applied to claims for breach of warranty under the Act—hence why the *Dunelawn* Court declined to address the issue in its opinion.

Finally, tolling the statute of limitations in this case through application of the "discovery rule" would be inconsistent with the rules of construction for and the purpose of a statute of limitations. *See Harkness v. Fitzgerald*, 1997 ME 207, ¶ 5, 701 A.2d 370 (quoting *Nuccio v. Nuccio*, 673 A.2d 1331, 1334 (Me. 1996)) ("Statutes of limitation are statutes of repose and . . . should be construed strictly in favor of the bar which it was intended to create . . . . The general purpose is 'to provide eventual repose for potential defendants and to avoid the necessity of defending stale claims.'"). Because there is no dispute that Plaintiffs filed their Complaint well over six years after taking a possessory interest in their condominium units, their claim for breach of the implied warranty of quality pursuant to of 33 M.R.S. §

5

1604-113 is barred by the six-year statute of limitations provided for in 33 M.R.S. § 1604-115(a). Summary judgment will be entered in favor of Defendants on Count VI of Plaintiffs' Complaint.

II.   The Defendants Are Entitled to Summary Judgment on Count VII of the Complaint Because The Evidence of Fraud Is Insufficient as a Matter of Law.

To prevail on a fraud claim, a plaintiff must prove the following elements by clear and convincing evidence:

> (1) A party made a false representation,
> (2) The representation was of a material fact,
> (3) The representation was made with knowledge of its falsity or in reckless disregard of whether it was true or false,
> (4) The representation was made for the purpose of inducing another party to act in reliance upon it, and
> (5) The other party justifiably relied upon the representation as true and acted upon it to the party's damage.

*Barr v. Dyke*, 2012 ME 108, ¶ 16, 49 A.3d 1280 (citing *Flaherty v. Muther*, 2011 ME 32, ¶ 45, 17 A.3d 640). To withstand a defendant's motion for summary judgment on a fraud claim, a plaintiff "must produce evidence that demonstrates that the existence of each element of fraud is 'highly probable' rather than merely likely." *Barnes v. Zappia*, 658 A.2d 1086, 1089 (Me. 1995); *see also Francis v. Stinson*, 2000 ME 173, ¶ 39, 760 A.2d 209.

The evidence proffered by Plaintiffs is insufficient to show that the existence of fraud is highly probable. First, Plaintiffs have failed to produce any evidence of an affirmative misrepresentation of a material fact. (Pl's Opp'g S.M.F. ¶¶ 12, 16-17.) Instead, Plaintiffs urge the Court to deny summary judgment on the basis that they are "entitled . . . to the reasonable inference" that the Defendants made misrepresentations to Plaintiffs to the effect that "the condominium units were in a functional condominium association that would comply with

6

Maine law and with the terms of its Declaration and Bylaws." (Pl's Opp'n Mot. Summ. J. 7 (citing *Levin v. Acadia Hosp. Corp.*, 2004 ME 35, ¶ 2, 845 A.2d 1178).) This is analogous to the argument rejected in *Barnes*, where the Law Court affirmed an entry of summary judgment in defendants' favor over plaintiffs' argument that "summary judgment was improperly granted because, based on the evidence presented, a jury could reasonably have found that . . . [d]efendants . . . made a series of misrepresentations intended to convey [a] false impression," but plaintiffs failed to produce evidence of "an affirmative misrepresentation of a material fact[.]" *Barnes*, 658 A.2d at 1089. Just as in *Barnes*, Plaintiffs here rely on an inference of misrepresentation but offer no direct evidence thereof. This is insufficient to show that it is "highly probable" that Defendants made any false misrepresentations to Plaintiffs. *See id.*

Furthermore, Plaintiffs have failed to produce evidence showing that they relied on any supposed misrepresentation by Defendants.[4] Plaintiffs miss the mark when they repeatedly assert that there is a dispute of fact as to whether they were provided a copy of the Declaration and Bylaws prior to closing. (Pl's Opp'g S.M.F. ¶¶ 10-11, 15-17.) Even if they were provided copies of the condominium's governing documents prior to closing, it does not necessarily follow that Plaintiffs relied on those documents and Defendant's supposed promise to follow them. In fact, Ms. Brown "testified at her deposition that she never received a copy of the Declaration and By Laws until this very lawsuit" and "further testified that she

---

[4] In their memorandum, Plaintiffs cite Pl's Opp'g S.M.F. ¶ 94 for the proposition that they relied on Defendants' alleged misrepresentations as to the governance of the condominium association and "would not have purchased the units but for these representations." (Pl's Opp'n Mot. Summ. J. 7.) However, paragraph ninety-four relies on interrogatory answers from the Plaintiffs that are directly contradicted by the deposition testimony summarized above. *See Cormier v. Genesis Healthcare LLC*, 2015 ME 161, ¶ 19 n.5, 129 A.3d 944 (citing *Zip Lube, Inc. v. Coastal Sav. Bank*, 1998 ME 81, ¶ 10, 709 A.2d 733) (holding that where an interrogatory answer is directly contradicted by sworn testimony, a party opposing summary judgment "cannot create a dispute of fact simply by contradicting her own sworn statement.").

7

did not rely upon those documents at the time she purchased her unit." (Def's Supp'g S.M.F. ¶¶ 10-11.) Mr. Maples similarly testified that he did not rely on any representations of Mr. Contorakes because he couldn't "recall talking to Mr. Contorakes on more than one or two occasions, and that was just in passing." (Def's Supp'g S.M.F. ¶ 16.) Plaintiffs purport to deny these facts in their opposing statement of material facts, but substantively deny only the premise that they were not provided copies of the Declaration and Bylaws.[5] (Pl's Opp'g S.M.F. ¶¶ 10-11, 15-17.) Plaintiffs do not deny that they did not rely on Defendants' supposed misrepresentations with respect to those documents. (*Id.*) In other words, whether the governance documents were provided to Plaintiffs prior to closing is immaterial, when there is (1) no evidence of an affirmative misrepresentation with respect to those documents and (2) no factual dispute that Plaintiffs did not rely on those documents or Defendants' supposed misrepresentations with respect to them.

In sum, Plaintiffs have failed to meet their burden on summary judgment to show that it is "highly probable" Defendants made any false representation, and furthermore it is undisputed that Plaintiffs did not rely on any such representation, even assuming arguendo that one was made. *See Oceanic Inn, Inc. v. Sloan's Cove, LLC*, 2016 ME 34, ¶ 26, 133 A.3d 1021; *Barnes*, 658 A.2d at 1089. Defendants' motion for summary judgment is granted with respect to Count VII of the Complaint. Plaintiffs' motion for summary judgment as to Count VII is denied. Summary judgment will be entered in favor of Defendants on Count VII of the Complaint.

---

[5] With regards to Mr. Maples, there is no dispute that he received a copy of the Declaration at the time he purchased his unit. (Def's Supp'g S.M.F. ¶ 15; Pl's Opp'g S.M.F. ¶ 15.) In the absence of any evidence of a misrepresentation with respect to the Declaration or of Mr. Maples' supposed reliance on that misrepresentation, the fact is immaterial.

8

III.	The Defendants are Entitled to Summary Judgment on Count VIII of the Complaint Because There Is No Basis on Which to Hold Evan Contorakes or Cheri Contorakes Personally Liable.

Count VIII of the Complaint does not state a cause of action; rather, it alleges individual liability on the part of Evan Contorakes and Cheri Contorakes for the various wrongs alleged in the Complaint. Although not clearly articulated, it seems Plaintiffs are seeking to hold the Contorakeses personally liable pursuant to several legal theories: (1) as to both Mr. Contorakes and Ms. Contorakes, individual liability for breach of fiduciary duties; (2) as to Mr. Contorakes, personal liability for wrongful acts committed as a director and officer of the Association, and liability as a member of the Association and the LLC pursuant to a "veil piercing" of those two entities; (3) as to Ms. Contorakes, personal liability for wrongful acts committed as a director and officer of the Association, and liability as a member of the Association pursuant to a "veil piercing" of the Association.[6]

Pursuant to the Bylaws, Plaintiffs are members of the Association by virtue of owning Compass Harbor condominium units. (Bylaws, §2.1 (Ex. H).)  Plaintiffs argue that the Contorakeses, as officers of the Association, personally owed them fiduciary duties by operation of statute. *See* 13-B M.R.S. § 720(1)(C) ("An officer of a corporation with discretionary authority shall discharge that officer's duties under that authority . . . [i]n a manner the officer reasonably believes to be in the best interests of the corporation *and its members.*") (emphasis added). It is undisputed that Plaintiffs' condominium units were

---

[6] Plaintiffs seem to conflate the two entity defendants—the Association and the LLC—in their counterargument to the Contorakeses' motion for summary judgment on the issue of personal liability. To be clear, Ms. Contorakes is not a member of the LLC. (Pl's Supp'g S.M.F. ¶ 1.). As explained below, she therefore cannot be held personally liable pursuant to a "veil piercing" of that entity.

9

subject to the terms of the Declaration. (Def's Supp'g S.M.F. ¶ 5.) Section 13.1(e) of the Declaration provides that:

> The Board of Directors, *and its members in their capacity as members, officers and employees* . . . . Shall have no personal liability in tort to a unit owner or any other person or entity, direct or imputed, by virtue of acts performed by or for them, except for the Board of Directors members' own *willful misconduct* or *gross negligence* in the performance of their duties[.]

(Def's Supp'g S.M.F. ¶ 19.) Thus, even if 13-B M.R.S. § 720(1)(C) imposes fiduciary duties on the Contorakeses as officers of the Association, the Contorakeses cannot be held liable in tort for breaching that duty by Plaintiffs unless the breach amounts to "willful misconduct or gross negligence." Plaintiffs adduce no evidence of willful misconduct or gross negligence on the part of the Contorakeses. They merely provide a laundry list of lapses in the management of the Association that are at most demonstrative of negligence or incompetence. "Willful misconduct" and "gross negligence" are terms of art that require more than mere negligence. *See Leadbetter v. Family Fun Mgmt.*, No. CV-17-173, 2018 Me. Super. LEXIS 34, at *17 (Feb. 6, 2018) ("The concept of 'gross negligence' is a 'synonym for willful and wanton injury' and has been described as the 'equivalent of wanton or reckless misconduct.'") (quoting *Blanchard v. Bass*, 153 Me. 354, 361, 139 A.2d 359, 363 (1958); *Bouchard v. Dirigo Fire Ins. Co.*, 114 Me. 361, 365, 96 A. 244, 246 (1916)); *see also WahlcoMetroflex, Inc. v. Baldwin*, 2010 ME 26, ¶ 16, 991 A.2d 44 (in the context of determining whether a corporate officer is entitled to the protection of the business judgment rule, "[g]ross negligence is defined as 'reckless indifference to or a deliberate disregard of the whole body of stockholders or actions which are without the bounds of reason.'"). In the absence of evidence of willful

10

misconduct or gross negligence, Plaintiffs cannot hold the Contorakeses personally liable for purported breaches of fiduciary duty arising out of their failings as officers of the Association.

Plaintiffs next seek to hold the Contorakeses individually liable for participation in wrongful acts performed in their capacity as directors and officers of the Association. Corporate officers "who participate in wrongful acts can be held liable for their individual acts, and such liability is distinct from piercing the corporate veil . . . . The individual liability stems from participation in a wrongful act, and not from facts that must be found in order to pierce the corporate veil." *Blue Star Corp. v. CKF Props., LLC*, 2009 ME 101, ¶ 44, 980 A.2d 1270 (quoting *Advanced Constr. Corp. v. Pilecki*, 2006 ME 84, ¶ 13, 901 A.2d 189).

Plaintiffs' opposition to Defendants' motion for summary judgment on Count VIII references their own motion for summary judgment on Count II of their Complaint. Plaintiffs' argument as to that count merely cites provisions of the Declaration and Bylaws describing the duties and responsibilities of Directors and Officers of the Association. (Pl's Supp'g S.M.F. ¶¶ 43-47.) The Bylaws are a contract between Association members (i.e., unit owners) and the Association itself, which acts through its Directors. *See Morison v. Wilson Lake Country Club*, 2005 ME 71, ¶ 20, 874 A.2d 885. If the Association has breached the obligations listed by Plaintiffs, then the Association may be liable to Plaintiffs for breach of contract. However, the Directors and Officers of the Association—i.e., the Contorakes—are insulated from personal liability for those breaches by operation of section 13.1(c) of the Declaration. It is undisputed that Plaintiffs' condominium units were subject to the terms of the Declaration. (Def's Supp'g S.M.F. ¶ 5.) Section 13.1(c) of the Declaration provides that:

> The Board of Directors, *and its members in their capacity as members, officers and employees* . . . . Shall have no personal liability in contract to a unit owner or any other person or entity

11

under any agreement, check, contract, deed, lease, mortgage, instrument or transaction entered into by them on behalf of the Board of Directors or the Association in the performance of the Board of Directors member's duties[.]

(Pl's Opp'g S.M.F. ¶ 18 (emphasis added).) The same contract that Plaintiffs allege the Association breached provides protection from liability for the Association's officers. Conceptually, when Plaintiffs accepted the terms of the Declaration, they understood the duties owed to them by the Association and, as part of the bargain, agreed not to hold the officers of the Association personally liable for failure to perform those duties. *Cf. Theberge v. Darbro, Inc.*, 684 A.2d 1298, 1301 (Me. 1996) (in the context of piercing the corporate veil, "because the party seeking relief in a contract case is presumed to have voluntarily and knowingly entered into an agreement with a corporate entity [she] is expected to suffer the consequences of the limited liability associated with the corporate business form") (quotation omitted).

In light of the foregoing the Court concludes that the Contorakeses are not personally liable to the Plaintiffs for "wrongful acts" performed in their capacity as officers of the Association or for breaches of their putative fiduciary duties owed to Plaintiffs under 13-B M.R.S. § 720(1)(C).

The Court next addresses whether Plaintiffs have adduced sufficient facts to pierce the "corporate veil" of the LLC or the Association.[7] "As a matter of public policy, 'corporations

---

[7] The LLC is the declarant of the Compass Harbor Condominiums. "The declarant is a fiduciary for the unit owners with respect to actions taken or omitted at his direction by officers and members of the executive board appointed by the declarant, and acting in those capacities, or elected by the members at a time when more than 50% of the voting rights are held by the declarant." 33 M.R.S. § 1603-103. There is no dispute that the Contorakeses are the only officers and board members of the Association, that they were appointed in the first instance by the LLC, and that the LLC has at all times owned more than fifty percent of Compass Harbor's units. (Pl's Supp'g S.M.F. ¶¶ 6, 21-23.)

12

are separate legal entities with limited liability.'" *Johnson v. Excl. Props. Unltd., Inc.*, 1998 ME 244, ¶ 5, 720 A.2d 568. Courts are "reluctant to disregard the legal entity and will cautiously do so only when necessary to promote justice." *Anderson v. Kennebec River Pulp & Paper Co.*, 433 A.2d 752, 756 n.5 (Me. 1981). "To pierce the corporate veil and disregard the corporate entity, a plaintiff must establish that: (1) the defendant abused the privilege of a separate corporate identity; and (2) an unjust or inequitable result would occur if the court recognized the separate corporate existence." *Blue Star Corp. v. CKF Props., LLC*, 2009 ME 101, ¶ 43, 980 A.2d 1270 (citing *Advanced Constr. Corp. v. Pilecki*, 2006 ME 84, ¶ 10, 901 A.2d 189). Whether there has been an abuse of the corporate form is determined by recourse to a twelve-factor balancing test. *See Johnson v. Excl. Props. Unltd., Inc.*, 1998 ME 244, ¶ 7, 720 A.2d 568. With regards to the second prong, "[s]ince piercing the corporate veil is an equitable remedy, it is consistent with equitable principles to disregard the corporate entity where a claimant demonstrates both: (1) some misuse of the privilege of the corporate form; and (2) an inequitable result." *Id.* ¶ 9.

Generally, "[w]hether the corporate form should be disregarded involves questions of fact for a fact-finder to decide." *Blue Star Corp. v. CKF Props., LLC*, 2009 ME 101, ¶ 43, 980 A.2d 1270 (citing *Advanced Constr*, 2006 ME 84, ¶ 10, 901 A.2d 189). However, summary judgment is still proper where the record evidence considered most favorably to plaintiff raises no disputes of material fact that would support piercing the corporate veil. *See id.* ¶ 45; *see also Alt. Nurs'g Care, Inc. v. C.H. Wright, Inc.*, 2003 Me. Super. LEXIS 114, *11-12 (granting summary judgment in favor of individual defendant "[b]ecause the facts properly before the court at summary judgment [did] not support the invocation of the doctrine of piercing the corporate veil . . . .").

The Contorakeses are entitled to judgment as a matter of law on the issue of whether the "corporate veil" of the Association can be pierced. In the nonprofit context, Maine does not recognize member, officer or director liability under a "veil-piercing" theory and there is no evidence in the record that could support a finding that either Mr. Contorakes or Ms. Contorakes is a shareholder of the Association.[8] Under Maine law, even when the corporate form is disregarded, only shareholders of the corporation can be held liable. *Thibodeau v. Cole*, 1999 ME 150, ¶ 7, 740 A.2d 40; *see also Coler & Colantonio, Inc. v. Quoddy Bay LNG, LLC*, BCD-CV-11-45, 2012 Me. Bus. & Consumer LEXIS 16, *6-7 (Bus. & Consumer Ct. Aug. 16, 2012, *Horton, J.*) ("Maine case law makes it clear that only shareholders may be held personally liable on a theory of piercing the corporate veil.") (citing *Thibodeau*, 1999 ME 150, ¶ 7, 740 A.2d 40).[9] The Court could not find any Maine authority allowing the corporate veil of a nonprofit corporation to be pierced in order to hold members, directors or officers of a nonstock, nonprofit corporation personally liable. The Court declines to extend the corporate veil theory on these facts in the absence of precedent from the Law Court.

Mr. Contorakes, as the sole member of the LLC, could be held liable if the corporate form of the LLC is disregarded. *See Blue Star Corp*, 2009 ME 101, ¶ 42, 980 A.2d 1270. However, the facts before the Court to support piercing the corporate veil with respect to the LLC are inadequate as a matter of law to show that Mr. Contorakes abused the privilege of the separate corporate identity of the LLC or that an inequitable result can only be avoided

---

[8] Pursuant to 33 M.R.S. § 1603-101, the Association "shall be organized as a nonprofit corporation under Title 13-B[.]" Non-profit corporations are prohibited from issuing shares of stock or paying dividends. 13-B M.R.S. § 407.

[9] This does not foreclose the possibility that a director or officer could be held individually liable for wrongful acts. *Blue Star Corp. v. CKF Props., LLC*, 2009 ME 101, ¶ 44, 980 A.2d 1270. However, as discussed above, because there is no evidence of willful misconduct or gross negligence on the part of either Mr. Contorakes or Ms. Contorakes, Plaintiffs cannot recover from the Contorakeses directly for the purported misconduct that Plaintiffs argue the Contorakeses participated in.

14

if the corporate form is disregarded. *See Blue Star Corp.*, 2009 ME 101, ¶ 43, 980 A.2d 1270. With respect to the first prong, there is simply no evidence that Mr. Contorakes used the LLC for some improper purpose. While there is some evidence that would superficially seem to satisfy some of the many factors recited by the Law Court in *Johnson*, no reasonable factfinder could conclude that these lapses are the result of "abuse" of the corporate form as opposed to mere incompetence or neglect. *See Johnson*, 1998 ME 244, ¶ 7, 720 A.2d 568. In other words, even though there may be factual disputes with respect to whether Mr. Contorakes mismanaged the LLC or used the LLC to pay Association expenses, they are not material in the absence of any evidence that Mr. Contorakes abused the corporate form to his own benefit or for some fraudulent or unlawful purpose.

Moreover, there is no evidence that an inequitable result can only be avoided by disregarding the corporate form or of "some misuse of the privilege of the corporate form." *Johnson*, 1998 ME 244, ¶ 9, 720 A.2d 568. Plaintiffs limited evidence of encumbrances on the substantial assets of the LLC are inadequate evidence of "an inequitable result." *Id. See also Advanced Constr. Corp. v. Pilecki*, 2006 ME 84, ¶ 12, 901 A.2d 189 (noting in dicta that where "there was no evidence that the corporation was undercapitalized, insolvent, or bankrupt" nor "evidence from which the jury could find that a verdict against [the corporation] would be worth less than a verdict against [the individual defendant personally]" the plaintiffs "did not satisfy the requirements for piercing the corporate veil").

In sum, the Court finds that the Contorakeses are entitled to judgment as a matter of law on the issue of personal liability. The facts cannot support a finding of officer liability on the part of either Mr. Contorakes or Ms. Contorakes in the performance of their duties as officers of the Association based on the limitation on individual liability provided for in the

Declaration. Furthermore, there are no facts to support piercing the corporate veil of the LLC to hold Mr. Contorakes liable as its sole member. Summary judgment will be entered in favor of the Defendants on Count VIII of the Complaint.

IV. Neither Party is Entitled to Summary Judgment on Remaining Counts.

Defendants have also moved for summary judgment on Count X of the Complaint, which states a claim for violation of Maine's Unfair Trade Practices Act ("UTPA"). 5 M.R.S. §§ 205-A through 214. Defendants' grounds for summary judgment on this count is that Plaintiffs failed to comply with the notice provision of 5 M.R.S. § 213. In relevant part, section 213 requires that:

> At least 30 days prior to the filing of an action for damages a written demand for relief, identifying the claimant and reasonably describing the unfair and deceptive act or practice relied upon and the injuries suffered, must be mailed or delivered to any prospective respondent . . . .

*Id.* § 213(1-A). Defendants point out that Mr. Contorakes never received any notice from either Plaintiff about violations of Maine's UTPA. (Def's Supp'g S.M.F. ¶ 37.)

Plaintiffs point out that the Law Court has held that failure to comply with the notice requirement of section 213 is not jurisdictional and does not preclude Plaintiffs from maintaining a UPTA claim. *Kilroy v. Ne. Sunspaces, Inc.,* 2007 ME 119, ¶ 15, 930 A.2d 1060. *Kilroy* reaffirmed the holding of *Oceanside at Pine Point Condo. Owners Ass'n v. Peachtree Doors,* 659 A.2d 267, 273 (Me. 1995), where the Law Court held that it was reversible error to enter summary judgment in favor of the defendant because there was no dispute that the plaintiff had failed to comply with section 213(1-A)'s notice provision. *Kilroy,* 2007 ME 119, ¶ 15, 930 A.2d 1060. Defendants concede that the rule from *Oceanside at Pine Point Condo. Owners Ass'n* forecloses the entry of summary judgment in their favor on this count. The

16

Court therefore denies Defendants' motion for summary judgment as to Count X of the Complaint.

Count I of the Complaint states a claim for breach of contract, specifically, the Declaration and Bylaws. To prevail on summary judgment, a plaintiff "has the burden to demonstrate that each element of its claim is established without dispute as to material fact within the summary judgment record." *Cach, LLC v. Kulas*, 2011 ME 70, ¶ 8, 21 A.3d 1015. The elements of breach of contract are (1) breach of a material contract term, (2) causation, and (3) damages. Plaintiffs move for summary judgment on the issue of liability only, acknowledging that the issue of damages will entail factual dispute. *See* M.R. Civ. P. 56(c) ("A summary judgment, interlocutory in character, may be rendered on the issue of liability alone although there is a genuine issue as to the amount of damages."). Thus, at this stage of the proceedings, Plaintiffs must show there is no dispute of fact on the issue of (1) whether Defendants breached a material term of the Declaration or Bylaws and (2) whether that breach caused Plaintiffs damages.

Plaintiffs adduce substantial evidence of breaches of the Declaration and Bylaws. (Pl's Supp'g S.M.F. ¶¶ 13-40.) Notwithstanding the fact that many of the underlying facts are denied or qualified by Defendants, Plaintiffs raise no argument that any of the many breaches listed on page four of their brief are *material* breaches. *See Jenkins, Inc. v. Walsh Bros.*, 2001 ME 98, ¶ 13, 776 A.2d 1229 ("A material breach is a non-performance of a duty that is so material and important as to justify the injured party in regarding the whole transaction as at an end. Whether a material breach has occurred is a question of fact.") (citations and quotations omitted). Furthermore, Plaintiffs make no attempt to show causation. Although Plaintiffs explicate approximately a dozen breaches of the Declaration or Bylaws by

17

Defendants, Plaintiffs do not argue that a single one resulted in damages.[10] The Court therefore concludes that Plaintiffs have failed to meet their burden on summary judgment as to Count I. Plaintiff's motion for summary judgment will be denied as to that Count.

Count II of the Complaint states a claim for breach of fiduciary duty. As explained above, Plaintiffs cannot recover from the Contorakeses personally on this Count. However, as Plaintiffs point out in their motion, the LLC is a fiduciary for Plaintiffs as unit owners with respect to actions taken or omitted at its direction by the Contorakeses because the LLC appointed them as officers and directors of the Association and at all times has held more than fifty percent of the voting rights of the Association. 33 M.R.S. § 1603-103(a). Thus, under 33 M.R.S. § 1603-103(a), the LLC could be held liable for breach of fiduciary duty based on actions taken by the Contorakeses in their capacity as officers and directors of the Association. Plaintiffs claim that the breaches of contract described in their argument for summary judgment on Count I are also breaches of fiduciary duty.

Notwithstanding the multiple disputes of fact underlying Plaintiffs' breach of contract claim, this is an inadequate basis on which to award summary judgment in Plaintiffs' favor. There is at best a dispute of fact as to whether any of the contract breaches amount to a breach of the duty loyalty. *See Stanton v. Univ. of Me. Sys.*, 2001 ME 96, 773 A.2d 1045 (holding that whether a party has breached a duty is a question of fact); *see also WahlcoMetroflex, Inc. v. Baldwin*, 2010 ME 26, ¶ 19, 991 A.2d 44 (applying Delaware law and holding that gross negligence is required to establish a breach of the duty of care). Moreover, Plaintiffs adduce

---

[10] Plaintiffs' argument in reply misses the mark. The Court is not holding, as Plaintiffs seem to suggest, that the Maine Condominium act "do[es] not matter." (Pl's Reply Br. 2.) The Court is not dismissing the Plaintiffs' claim for breach of contract. The Court is merely holding Plaintiffs to their burden on summary judgment to present prima facie evidence of every element of their claim.

no evidence of causation. *See Niehoff v. Shankman & Assocs. Legal Ctr., P.A.*, 2000 ME 214, ¶ 8, 763 A.2d 121 ("The same rules of causation generally apply whether the cause of action sounds in contract, negligence, or breach of fiduciary duty."). Even assuming that a breach has occurred, there is no evidence that such breach has caused the Plaintiffs any damages. In sum, Plaintiffs are not entitled to summary judgment on Count II of their Complaint and their motion is denied as to that Count.

Count III of the Complaint does not state a claim, but rather seeks the equitable remedy of unjust enrichment. Plaintiffs do not specifically address this Count in their memorandum, but do argue that they are entitled to the return of all assessments paid in the context of their argument in support of summary judgment on Count IX of the Complaint, which seeks a declaratory judgment pursuant to 14 M.R.S. § 5951 that Defendants have violated the Declaration and Bylaws and an order requiring the Defendants to "disgorge" assessments paid by Plaintiffs. To recover under an unjust enrichment theory, a party must prove (1) that it conferred a benefit on the other party; (2) that the other party had "appreciation or knowledge of the benefit;" and (3) that the "acceptance or retention of the benefit was under such circumstances as to make it inequitable for it to retain the benefit without payment of its value." *Howard & Bowie, P.A. v. Collins,* 2000 ME 148, ¶ 13, 759 A.2d 707 (citing *June Roberts Agency v. Venture Properties,* 676 A.2d 46, 49 (Me. 1996)). Notwithstanding Plaintiffs' failure to make a prima facie showing of any of these elements, the third element requires the resolution of factual disputes. Even assuming that Defendants violated some provisions of the Declaration or Bylaws, material or not, Plaintiffs' entitlement to recovery for those violations, whether in the nature of damages or restitution, requires the resolution of factual disputes over the amount of Plaintiffs' damages or the extent to

19

which, if any, Defendants' enrichment was unjust. *See* Horton & McGehee, *Maine Civil Remedies* § 7-3 at 175 (4th ed. 2004) ("For restitutionary relief to be afforded, it must be necessary to prevent unjust enrichment; the measure of restitution is the extent of the injustice."). Plaintiffs' motion is denied with respect to Count III and Count IX.

Count IV of the Complaint does not state a claim for a cause of action, but rather seeks the equitable remedy of specific performance of Defendants' obligations under the Declaration and Bylaws. Plaintiffs argument on this Count is premised on their prevailing on Count I (breach of contract) on summary judgment. Plaintiffs have not prevailed on their breach of contract claim and as such the Court can order no remedy, in law or equity. Plaintiffs' motion is denied as to Count IV.

Count V of the Complaint also seeks "specific performance" pursuant to Defendants' alleged violation of 13-B M.R.S. § 715. In their motion, Plaintiffs clarify that they are seeking an award of costs and attorney fees pursuant to 13-B M.R.S. § 715(2)(A), but this is predicated on the Court concluding that Defendants violated 13-B M.R.S. § 715(1) by failing to maintain certain records and failing to permit Plaintiffs to inspect records. Multiple factual disputes preclude the Court from granting summary judgment in Plaintiffs favor on Count V. Plaintiffs adduce no evidence of whether their request to inspect the records was for a "proper purpose" under section 715(1); it is undisputed that Plaintiffs did receive some of the requested records and eventually obtained all of the requested records, and there is factual dispute as to whether the Association's refusal to permit inspection of certain records was in good faith. (Pl's Supp'g S.M.F. ¶¶ 48-55; Def's Opp'g S.M.F. ¶¶ 48, 50, 53, 55.) Furthermore, the Court has not "ordere[ed] inspection and copying of the records demanded," a prerequisite for the Court to order the Association to pay costs and attorney

20

fees. 13-B M.R.S. § 715(2)(A). Plaintiffs are not entitled to summary judgment on Count V of their Complaint, and their motion is denied as to that Count.

Plaintiffs have also moved for summary judgment on all three counts of the Counterclaim (although they do not seriously develop their argument). The Counterclaim states claims for breach of contract, unjust enrichment, and quantum meruit. It is undisputed that Plaintiffs have refused to pay assessments. Plaintiffs argue this is not a breach of contract because the assessments charged were not made in accordance with the budget approval process required under the Bylaws. Defendants respond that Plaintiffs' reliance on the Bylaws is misplaced and that the assessments were properly made in accordance with the Declaration. Regardless, Plaintiffs argue their failure to pay assessments is excused by Defendants' material breaches. But the materiality of those alleged breaches is very much in dispute. Thus, there are genuine disputes of facts which preclude summary judgment on Court I of the Counterclaim for breach of contract.

The uncertainty surrounding whether Plaintiffs' refusal to pay their assessments puts them in breach of contract forecloses entry of summary judgment on Count II and Count III of the Counterclaim, notwithstanding both sides' agreement that the Declaration and Bylaws are express contracts between the parties. *See* Horton & McGehee, *Maine Civil Remedies* § 7-5(a) at 178 (4th ed. 2004) ("[T]he existence of an express contract between the parties does not limit restitution remedies if the contract has been rescinded, abandoned, or terminated, or if it is unenforceable or invalid.") In other words, if the Defendants fail to prove that Plaintiffs are liable in breach of contract for their failure to pay assessments, this does not foreclose the possibility that Defendants can nonetheless prove that it is inequitable for

21

Plaintiffs to have enjoyed Compass Harbor without having paid their share of the common expenses.

## CONCLUSION

For all the foregoing reasons, the entry will be:

1. Defendants' motion for summary judgment is granted in part and denied in part. Defendants' motion is granted as to Count VI, Count VII, and Count VIII of Plaintiffs' Complaint. Summary judgment is to be entered in Defendants' favor on those Counts. Defendants' motion is denied as to Count X.

2. Plaintiffs' motion for summary judgment is denied.

So Ordered.

Pursuant to M.R. Civ. P. 79(a), the Clerk is instructed to incorporate this Order by reference on the docket for this case.

Dated: **2-12-2019**

_MAAuddy_

Michael A. Duddy
Judge, Business and Consumer Docket

Entered on the Docket: 2-13-19
Copies sent via Mail ___ Electronically ✓

22

STATE OF MAINE
CUMBERLAND, ss.

SUPERIOR COURT
BUSINESS AND CONSUMER COURT
LOCATION: PORTLAND
DOCKET NO. BCD-CV-2018-02✓

CHARLES R. MAPLES, et al., )
                       )
    Plaintiffs/ Counterclaim- )
    Defendants, )
                       )    ORDER ON COUNTERCLAIM-
v.                    )    DEFENDANTS' MOTION TO DISMISS
                       )    COUNTS II AND III OF THE
EVAN CONTORAKES, et al., )   COUNTERCLAIM.
                       )
    Defendants/
    Counterclaim- Plaintiffs.

This matter comes before the Court on Plaintiffs'/ Counterclaim-Defendants' Charles R. Maples ("Maples") and Kathy S. Brown's ("Brown") (collectively "Counterclaim-Defendants") motion to dismiss Count II and Count III of Defendants'/ Counterclaim-Plaintiffs' Compass Harbor Village, LLC and Compass Harbor Village Condominium Association's (collectively "Compass") Counterclaim pursuant to M.R. Civ. P. 12(b)(6). Compass opposes the motion. Pursuant to the authority granted it by M.R. Civ. P. 7(b)(7), the Court exercised its discretion and will rule on the motion without holding oral argument.

## PROCEDURAL POSTURE AND FACTUAL BACKGROUND

Compass Harbor Village, LLC is the developer and declarant of the Compass Harbor Village Condominiums ("Compass Harbor") in Bar Harbor, Maine. (Pl's Compl. ¶ 5.) The Counterclaim-Defendants are the owners of Compass Harbor condominium units. (Pl's Compl. ¶¶ 1-2.) Compass is responsible for the management of the condominium units, including but not limited to: payment of on-going bills, regular maintenance, and collection of dues from the owners of condominiums. (Pl's Compl. ¶ 30.) In their Complaint, Maples and Brown assert eleven causes

1

of action against Compass arising out of the latter's alleged mismanagement of Compass Harbor, including a count for breach of contract. (Pl's Compl. ¶¶ 37-40.) In its answer to the Complaint, Compass responded with a Counterclaim against the Counterclaim-Defendants based on their alleged failure to pay association dues and other fees. The Counterclaim asserts three causes of action: breach of contract (Count I), unjust enrichment (Count II), and quantum meruit (Count III).

## STANDARD OF REVIEW

In reviewing a motion to dismiss under Rule 12(b)(6), courts "consider the facts in the complaint as if they were admitted." *Bonney v. Stephens Mem. Hosp.*, 2011 ME 46, ¶ 16.17 A.3d 123. The complaint is viewed "in the light most favorable to the plaintiff to determine whether it sets forth elements of a cause of action or alleges facts that would entitle the plaintiff to relief pursuant to some legal theory." *Id.* (quoting *Saunders v. Tisher*, 2006 ME 94, ¶ 8, 902 A.2d 830). "Dismissal is warranted when it appears beyond doubt that the plaintiff is not entitled to relief under any set of facts that he might prove in support of his claim." *Id.*

## DISCUSSION

The issue on this motion to dismiss is whether the purported acknowledgement by both parties that a binding contract exists between the parties precludes Compass from pleading claims for unjust enrichment and quantum meruit.[1] The Counterclaim-Defendants argue that because recovery for unjust enrichment is limited to those situations in which "there is no contractual relationship," the apparent mutual acknowledgement of the existence of a valid contract precludes such a claim. *See, e.g., Lynch v. Ouellette,* 670 A.2d 948 (Me. 1996); *see also Hodgkins v. New Eng. Tel. Co.,* 82 F.3d 1226, 1231 (1st Cir. 1996). Compass argues that its Counterclaim merely permissibly pleads alternative theories of relief and, furthermore, that the existence of a contract

---

[1] For purposes of deciding the instant motion, the analysis is analogous for unjust enrichment and quantum meruit claims.

2

does not preclude claims for unjust enrichment that arise out of issues outside the subject matter of the contract.

I.   MAINE LAW ALLOWS PLEADING IN THE ALTERNATIVE EVEN WHERE A PARTY ALLEGES THE EXISTENCE OF A BINDING CONTRACT

Maine law has long recognized that a plaintiff may allege the existence of a contract and seek recovery under an unjust enrichment theory in the same pleading. Under the Maine Rules of Civil Procedure, a party is specifically permitted to plead in the alternative. M.R. Civ. P. 8(e). Acknowledging a change under Maine law, the Reporter's Note of 1959 provides: "Rule 8(e)(2) permits pleading in the alternative or in hypothetical form. This is a change in Maine law. *Macurda v. Lewiston Journal Co.*, 104 Me. 554, 72 A.490 (1908)." M.R. Civ. P. 8(e) reporter's notes.

While our Law Court has recognized "that the existence of a contract precludes recovery on a theory of unjust enrichment because unjust enrichment describes recovery . . . when there is no contractual relationship," *June Roberts Agency, Inc. v. Venture Properties, Inc.,* 676 A.2d 46, 49 n. 1 (Me.1996), a party "is not precluded from pleading both theories because a factfinder may find that no contract exists and may still award damages on a theory of unjust enrichment." *Id.*; *see also Bates v. Anderson,* 614 A.2d 551, 552 (Me.1992).

Furthermore, Counterclaim-Defendants' reliance on *Lynch* is misplaced. In *GMAC Comm'l Mortg. Corp. v. Gleichman*, the United States District Court for the District of Maine distinguished *Lynch*, explaining that that case merely held that a plaintiff is precluded from any recovery under a theory of unjust enrichment where the trial court had already determined that a contractual relationship existed between the parties. 84 F. Supp. 2d 127, 137 (D. Me. 1999). Here, as in *GMAC Comm'l Mortg. Corp* and unlike in *Lynch*, no such express finding has been made. *Id.* The alleged contract was not attached to any pleading and is thus not before the Court. In the

absence of a judicial determination that a valid contract governs the dispute between the parties, Compass cannot be foreclosed from seeking relief under an unjust enrichment theory.

II.    CLAIMS FOR UNJUST ENRICHMENT ARE ALLOWED WHERE THE CLAIM ARISES OUT OF SUBJECT MATTER NOT COVERED BY THE CONTRACT

The United States District Court for the District of Maine has held that a party is not precluded from bringing a claim for unjust enrichment where the claim arises out of subject matter not covered by the contract. *See Fed. Ins. Co. v. Maine Yankee Atomic Power Co.*, 183 F. Supp. 2d 76, 84 (D. Me. 2001) ("It is reasonable to understand [the Law Court's pronouncement that that the existence of a contract precludes recovery on a theory of unjust enrichment] . . . as stating that a contract *covering the same subject matter* forecloses an unjust enrichment claim.") (emphasis added). Compass suggests that this may apply to its claims against the Counterclaim-Defendants, arguing that "as discovery continues evidence will show that Compass provided benefits to [Counterclaim-Defendants] that would be outside any contract and [Counterclaim-Defendants] are obligated to repay to Compass for those benefits that the [Counterclaim-Defendants] should not be allowed to keep without payment." (Def's Opp. Mot. Dismiss 5.)

The Court agrees with the reasoning of *Fed. Ins. Co.* In Counterclaim Counts II and III, Compass claims that is has conferred a benefit on the Counterclaim-Defendants for which it is entitled to compensation. (Def's Countercl. ¶¶ 17-20, 22-24.) At this stage of the proceedings, the Court cannot determine whether the claims stated in those counts fall within the subject matter of the alleged contract.

**CONCLUSION**

By the reason of the foregoing it is hereby ORDERED:

That the Plaintiffs' motion to dismiss Counts II and III of the Counterclaim is DENIED.

4

The Clerk is requested to enter this Order on the docket for this case by incorporating it by reference pursuant to Maine Rule of Civil Procedure 79(a).

Dated: __4/13/18__

_____
Richard Mulhern,
Judge, Business and Consumer Court

5